# Exhibit A

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| EASTERN AREA SPECIAL SCHOOLS, | CIVIL DIVISION |
| Plaintiff, | No. |
| v. | |
| BASF CORPORATION, and SIEMENS INDUSTRY, INC., | |
| Defendants. | COMPLAINT |

Filed on behalf of:
EASTERN AREA SPECIAL SCHOOLS
Plaintiff

**NOTICE TO PLEAD**
TO: ALL DEFENDANTS

Counsel of Record for This Party:

YOU ARE HEREBY NOTIFIED
TO FILE A WRITTEN RESPONSE
TO THE ENCLOSED COMPLAINT WITHIN
TWENTY (20) DAYS FROM SERVICE HEREOF
OR A DEFAULT JUDGMENT MAY BE
ENTERED AGAINST YOU.

ANDREWS AND PRICE, LLC

William C. Andrews
Pa.I.D. No. 17226

Andrew F. Evankovich
Pa.I.D. No. 53460

Amy R. Schrempf
Pa.I.D. No. 87619

ANDREWS AND PRICE, LLC
By: */s/ Amy R. Schrempf*

Attorney for Plaintiff

ANDREWS AND PRICE, LLC
1500 Ardmore Boulevard
Suite 506
Pittsburgh, PA 15221

412-243-9700
412-243-9660 (FAX)

**JURY TRIAL DEMANDED!**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| EASTERN AREA SPECIAL SCHOOLS, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BASF CORPORATION, and | ) | |
| SIEMENS INDUSTRY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE TO DEFEND

<u>YOU HAVE BEEN SUED IN COURT.</u> If you wish to defend against the claims set forth in the following pages, you must take action within TWENTY (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

LAWYER REFERRAL SERVICE
The Allegheny County Bar Association
3rd Floor Koppers Building
436 Seventh Avenue
Pittsburgh, Pennsylvania 15219
Telephone: 412-261-5555
www.acbalrs.org

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| EASTERN AREA SPECIAL SCHOOLS, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BASF CORPORATION, and | ) | |
| SIEMENS INDUSTRY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

COMPLAINT IN CIVIL ACTION

AND NOW COMES, the Plaintiff, Eastern Area Special Schools, by and through its attorney, William C. Andrews, Andrew F. Evankovich, and Amy R. Schrempf and Andrews and Price, LLC, and files this Complaint in Civil Action based on the following:

1.      Plaintiff is Eastern Area Special Schools, also known as Eastern Area Special School Joint Committee, a legal entity and joint school board, organized and existing pursuant to the Pennsylvania School Code, organized through a Jointure Agreement, created by an original Agreement dated June 30, 1964, and most recently amended, restated and executed in 2017, located at 550 Aura Drive, Monroeville, Allegheny County, Pennsylvania 15146.

2.      Defendant is BASF, a Delaware corporation that conducts business throughout the United States, including in Pennsylvania, with an office at 370 Frankfort Road, Monaca, Beaver County, Pennsylvania. Its North American headquarters are 100 Park Avenue, Florham Park, New Jersey 07932 (hereinafter referred to as "BASF").

3.      Defendant is Siemens Industry, Inc, a Delaware corporation that conducts business throughout the United States, specifically in Pennsylvania, with a business address at 600 Bursca

Drive, Suite 606, Bridgeville, Allegheny County, Pennsylvania 15017 (hereinafter referred to as "Siemans").

4.      Plaintiff owns a building located at 550 Aura Drive, Monroeville, Allegheny County, known as the "Sunrise School."

5.      On or about June 25, 2012, Plaintiff and Defendant Siemens entered into a contract related to an Energy Savings Plan pursuant to the Guaranteed Energy Savings Act, 62 Pa.C.S.A. § 3751. A copy of the pertinent sections of that contract is attached hereto as Exhibit "A" (The full contract is not attached due to its size but will be reproduced upon demand).

6.      Part of that Energy Savings Plan included a new roofing system for the Plaintiff's Sunrise School.

7.      Under that Agreement, Defendant Siemens was to repair and recoat the existing roof, including installation of a polyurethane foam and silicone roofing system; seven (7) extra roof drains to facilitate drainage; repairs and replacement of delaminated areas of the sub roof; installation of special fasteners through the EPDM surface as required by the polyurethane foam manufacturer (Defendant BASF); and installation of a polyurethane foam covering and specific silicone topcoat.

8.      Defendant Siemens created and provided the design of the roofing system that was installed on Sunrise School.

9.      Under the contract, Defendant BASF manufactured the roofing system's components., including the polyurethane foam, that were installed on Sunrise School.

10.     Under the contract, Defendant BASF provided a fifteen (15) year guarantee and warranty.

11.     After the execution of the June 25, 2012 contract, the roofing system was installed at Plaintiff's Sunrise School.

12.     Plaintiff believes and therefore avers that Defendant Siemens coordinated with Cardinal Group Services, Inc. for the actual installation of the roofing system.

13.     At some time after installation, the roof began to leak. Minor roof leaks were addressed, but now roof leaks became significant and unable to be patch-repaired.

14.     The leaks were unable to be repaired and have begun to impact the Plaintiff's ability to educate students in the Sunrise School location, because Plaintiff must section off portions of its building as unusable.

15.     On or about October 10, 2019, all parties convened at Plaintiff's Sunrise School to review the structure and to address the roofing system failure.

16.     There was no action taken after the October 10, 2019 meeting.

17.     In July of 2020, it was discovered that the polyurethane foam roofing system should not have been installed over top of the existing EPDM roof, that the prior expansion joints acted in a way to crack and damage the polyurethane foam and topcoat, that the polyurethane foam is absorbing moisture, the fiberboard substrate is retaining moisture, moisture is collecting between the pre-existing EPDM membrane and the fiberboard allowing ponding between layers, roof drains were improperly coated and/or clogged by the polyurethane foam, roof drains are inadequate to facilitate proper drainage, and holes created by the fasteners for the fiberboard are permitting infiltration of water and moisture into the building.

18.     On or about July 30, 2020, Plaintiff obtained a roof moisture survey that showed approximately seventy (70) percent of the roof area contains wet foam and fiberboard insulation, several areas of ponding water, and core and silt samples confirmed significant moisture.

19.     The roofing system has failed, is improperly designed, constructed and/or installed, and will require full replacement.

20.     As a result of the roofing system's failure, the Plaintiff's Sunrise School Roof and building has corrosion of the metal roof deck, damage to the building's structural integrity due to increased weight with ponding of water and saturated insulation, and loss of thermal resistance.

21.     As a result of the roofing system's failure, the Plaintiff's Sunrise School facility has been deprived the use of sections of its building, being forced to cordon off certain sections.

## COUNT I: Plaintiffs v. Defendant Siemens
### Breach of Contract

22.     Plaintiff hereby incorporate Paragraphs 1 through 21 as though the same were set forth herein at length.

23.     On June 25, 2012, Plaintiff entered into an Energy Savings Plan with Defendant Siemens, which contemplated the installation of a new roof system.

24.     Part of that Energy Savings Plan included a new roofing system for the Plaintiff's Sunrise School.

25.     As part of the Energy Savings Plan, Defendant Siemens prepared the scope of work for the roof system repair and replacement.

26.     Defendant Siemens also provided the design and concept of the roof system that was installed.

27.     Under the parties' Agreement, Defendant Siemens was to repair and recoat the existing roof; install a polyurethane foam and silicone roofing system; install seven (7) extra roof drains to facilitate drainage; repair and replace delaminated areas of the sub roof; install special

fasteners through the EPDM surface as required by the polyurethane foam manufacturer (Defendant BASF); and install both polyurethane foam covering and silicone topcoat.

28.     The roofing system has failed in that significant water infiltrates the roof, and leaks into the interior of the building.

29.     Although patches were attempted, the roof cannot be patched at this point due to the multitude of failure areas and must be replaced.

30.     Plaintiff believes and therefore avers that the roof was not designed, constructed and/or installed properly.

31.     Defendant Siemens breached its agreement with Plaintiff, in general and in the following particulars:

        a.      Failing to provide a roofing system that would function as to not allow water infiltration;

        b.      Failing to properly design a roofing system that would adequately function at the Sunrise School location;

        e.      Failing to require the removal of the EPMD roofing membrane prior to installation of the polyurethane roofing system;

        f.      Failing to correct design flaws or design omissions that allowed for fastener intrusion into the roofing membrane, allowing entry points for moisture;

        d.      Failing to properly install fasteners in a way to not permit water and moisture infiltration;

        g.      Failing to allow for proper drainage slope of roof;

        h.      Failing to provide an adequate number of roof drains to facilitate proper drainage and lessen water ponding;

i.      Failing to correct design flaws that allowed for the movement of expansion joints in the roof deck and along the parapet walls that caused the polyurethane foam to weaken and crack;

j.      Failing to provide even spray coating of polyurethane foam to ensure an even surface, to lessen water ponding;

32.      As a result of the roofing system's failure, Sunrise School will require full roof replacement.

33.      As a result of the roofing system's failure, the Plaintiff's Sunrise School Roof has corrosion of the metal roof deck, damage to the building's structural integrity due to increased weight with ponding of water and saturated insulation, and loss of thermal resistance.

34.      As a result of the roofing system's failure, the Plaintiff's Sunrise School facility has been deprived the use of sections of its building, being forced to cordon off certain sections.

WHEREFORE, Plaintiff claims of Defendant Siemens damages in an amount in excess of Arbitration Limits.

<u>**COUNT II: Plaintiff v. Defendant BASF**</u>
<u>**Breach of Warranty**</u>

35.      Plaintiff hereby incorporate Paragraphs 1 through 34 as though the same were set forth herein at length.

36.      Plaintiff entered into an Energy Savings Plan with Defendant Siemens, which included the installation of a new roof system.

37.      Defendant Siemens proposed, designed and coordinated that installation, and under that Agreement, Defendant BASF supplied the roofing components.

38.      BASF has provided a warranty to Plaintiff, providing that the "BASF Coating/Polyurethane Roof System which consists of BASF Coating, BASF polyurethane foam and

granules if applicable (the "System") applied to the structure described above will remain free of water leaks, which are due to deterioration of any component of the System resulting from ordinary weathering or improper workmanship in its installation." A copy of that warranty is attached as Exhibit "B".

39.     Defendant breached this express warranty in that the roof has significant leaks that it has not repaired and in fact cannot be repaired. For example, immediately prior to the 2020-2021 winter season, at least forty (40) patches were placed on the Sunrise School roof, which continues to leak.

40.     Plaintiff notified Defendant BASF of the failure in the roof through multiple verbal discussions, a meeting on site with all parties on October 10, 2019, and finally by letter dated January 10, 2020. A copy of this letter is attached hereto as Exhibit "C".

41.     Defendant BASF has breached its warranty in that it has failed to provide a structure free from water leaks for a period of fifteen (15) years.

42.     As a direct and proximate result of the Defendant BASF's breach of warranty, in failing to repair the roofing system, the Plaintiffs' Sunrise School facility has been deprived the use of its building and has been forced to cordon off portions of its facility.

43.     As a direct and proximate result of the Defendant BASF's breach of warranty, in failing to repair the roofing system, the roof will now require full replacement.

44.     As a direct and proximate result of the Defendant BASF's breach of warranty, in failing to repair the roofing system, the Plaintiff's Sunrise School Roof has corrosion of the metal roof deck, damage to the building's structural integrity due to increased weight with ponding of water and saturated insulation, and loss of thermal resistance

WHEREFORE, Plaintiffs claims of Defendants damages in an amount in excess of Arbitration Limits.

Respectfully submitted,

*/s/ Amy R. Schrempf*

Amy R. Schrempf
Pa. I.D. No. 87619

ANDREWS AND PRICE
1500 Ardmore Boulevard
Suite 506
Pittsburgh, PA 15221

# **V E R I F I C A T I O N**

I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.  I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. Section 4904 relating to unsworn falsifications to authorities.


Signed:        */s/ Stephen P. Puskar*
                    As President of the Eastern Area Board of School Directors
                    On behalf of all Plaintiffs


Date:         _____

**CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the PUBLC ACCESS POLICY

OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA: CASE RECORDS OF THE

APPELLATE AND TRIAL COURTS that require filing confidential information and documents

differently than non-confidential information and documents.

Submitted by:

*/s/ Amy R. Schrempf*

Amy R. Schrempf
Pa. I.D. No. 87619

ANDREWS AND PRICE
1500 Ardmore Boulevard
Suite 506
Pittsburgh, PA 15221

# PERFORMANCE CONTRACTING AGREEMENT
### between
## Eastern Area Special Schools Committee
### and
## Siemens Industry, Inc.,
## Building Technologies Division

TABLE OF ARTICLES

1.   Agreement
2.   Glossary
3.   General
4.   Performance Guarantee
5.   Work by SIEMENS
6.   The CLIENT'S Responsibilities
7.   Changes and Delays
8.   Compensation
9.   Acceptance
10.  Insurance and Allocation of Risk
11.  Hazardous Material Provisions
12.  Miscellaneous Provisions
13.  Maintenance Services Program

# PERFORMANCE CONTRACTING AGREEMENT

Number: 440P-106982

**Article 1**
**AGREEMENT**

THIS **PERFORMANCE CONTRACTING AGREEMENT** ("Agreement") is made this 25th day of June, 2012 (the "Effective Contract Date", defined below), by and between Siemens Industry, Inc., Building Technologies Division ("SIEMENS") and the party identified below as the CLIENT.

**The CLIENT**: Eastern Area Special Schools Joint Committee
550 Aura Road
Monroeville, PA  15146

DESIGNATED REPRESENTATIVE: Alan Friedman
PHONE: 412-394-5732   FAX: 412-394-5783

**Siemens Industry, Inc., Building Technologies Division**
1000 Deerfield Parkway
Buffalo Grove, Illinois 60089

With offices at:   600 Bursca Drive
Suite 606
Bridgeville, PA 15017

DESIGNATED REPRESENTATIVE: Chris A. Lawrence
PHONE: 412-257-2111   FAX: 412-257-0220

For Work and Services in connection with the following project (the "Project"):

Sunrise School Guaranteed Savings Program

The CLIENT considered performing the following FIMs but at this time, has determined to exclude them from the Scope of Work and Services, Exhibit A:
**Chiller(s) and Air Cooled Condenser(s) Replacement**
Weatherization

PCA-100 **PUBLIC** version 2009R

## PERFORMANCE CONTRACTING AGREEMENT

**Articles and Attachments**

This Agreement consists of this document, which includes the following articles and exhibits which are acknowledged by the CLIENT and SIEMENS and incorporated into the Agreement by this reference:

Articles
1. Agreement
2. Glossary
3. General
4. Performance Guarantee
5. Work BY SIEMENS
6. The CLIENT'S Responsibilities
7. Changes and Delays
8. Compensation
9. Acceptance
10. Insurance and Allocation of Risk
11. Hazardous Material Provisions
12. Miscellaneous Provisions
13. Maintenance Services Program

Exhibits
Exhibit A     Scope of Work and Services
Exhibit B     Payment Schedule(s)
Exhibit C     Performance Assurance
Appendix      Savings Calculations

This Agreement, when executed by an authorized representative of the CLIENT and authorized representatives of SIEMENS, constitutes the entire, complete and exclusive agreement between the Parties relative to the project scope stated in Exhibit A. This Agreement supersedes all prior and contemporaneous negotiations, statements, representations, agreements, letters of intent, awards, or proposals, either written or oral relative to the same, and may be modified only by a written instrument signed by both Parties.

**COMPENSATION/TERMS OF PAYMENT:**

As full consideration for the performance of the Work and Services set forth in Exhibit A, and for the Performance Assurance set forth in Exhibit C, the CLIENT shall pay SIEMENS in such manner and amounts as agreed to in Exhibit B.

Agreed for     **Eastern Area Special Schools Joint Committee**
(Signature) by:     _____

Print Name and Title:     _____
(Signature) by:     _____
Print Name and Title:     _____

Agreed for     **Siemens Industry, Inc.**
(Signature) by:     _____
Print Name and Title:     _____
(Signature) by:     _____
Print Name and Title:     _____

Agreement                                                                 PCA-100 **PUBLIC** version 2009R

# PERFORMANCE CONTRACTING AGREEMENT

**Article 2**
**Glossary**

The following terms shall for all purposes have the meanings stated herein, unless the context otherwise specifies or requires, or unless otherwise defined in the Agreement:

*"Acceptance"* means the CLIENT has signed, or is deemed to have signed, a Certificate of Substantial Completion.

*"Acceptance Date"* means the date on which the CLIENT signs or is deemed to have signed a Certificate of Substantial Completion.

*"Annual Performance Assurance Report"* means the document prepared by SIEMENS and submitted to the CLIENT as part of the Performance Assurance Service Program, which identifies the Savings achieved for the applicable Annual Period.

*"Annual Period"* means a twelve (12) month period beginning on the Guarantee Date or on any anniversary date thereof.

*"Annual Realized Savings"* means the actual Savings achieved by the CLIENT during an Annual Period, calculated as the sum of the Measured & Verified Savings plus the Stipulated Savings.

*"Baseline"* means the measurements of Facility energy usage taken prior to the Effective Contract Date, and the Facility operating practices in effect prior to the Effective Contract Date, as set forth in the Performance Assurance, Exhibit C.

*"Baseline Period"* means the period of time from which data is provided to SIEMENS to derive the Baseline measurements. The Baseline Period is set forth in the Performance Assurance, Exhibit C.

*"BTU"* means a British Thermal Unit and is a unit of thermal energy.

*"Capital Off-Set Savings"* means a sub-category of Operational Savings where Savings will result in a cost effective upgrade to the Facility to address one or more of the following issues; potential future increased costs, comfort, code non-compliance, usage requirements, user needs and/or expectations.

*"Certificate of Substantial Completion"* means the document indicating that the Work, or a designated portion of the Work, is Substantially Complete in accordance with the Agreement.

*"CLIENT Representative"* means the person identified to SIEMENS by the CLIENT as the person authorized to make decisions on behalf of the CLIENT as set forth in Section 6.1(a) hereof.

*"Construction Period"* means the period between the Effective Contract Date and the first day of the month following the date of Substantial Completion.

*"Construction Period Savings"* means the actual accumulated Measured & Verified Savings plus the Stipulated Savings achieved from the Effective Contract Date until the Guarantee Date.

*"Contracted Baseline"* means the post-FIM-implementation Facility operating profile based on parameters described in Exhibit C, which the CLIENT shall maintain throughout the Performance Guarantee Period and are relied upon by SIEMENS for the calculation of Guaranteed Savings as provided in the Performance Assurance, Exhibit C. The Contracted Baseline must also include stipulated hours of operation and plug-loads for all Facilities, and must include stipulated blended, or non-blended, utility rates.

*"Deferred Maintenance"* means a sub-category of Operational Savings where Savings results from a reduction of current or potential future repair and maintenance costs due to certain work being performed hereunder where such work had been previously postponed.

*"Deliverable"* means a report or drawing specifically prepared for and deliverable to the CLIENT.

*"Effective Contract Date"* is the date appearing at the top of this Agreement, unless specifically indicated otherwise.

## PERFORMANCE CONTRACTING AGREEMENT

*"Energy Conservation Measure"* or *"ECM"* means the equipment, devices, materials and/or software as installed by SIEMENS at the Facilities, or as repaired or replaced by the CLIENT hereunder, for the purpose of improving the efficiency of utility consumption.

*"Equipment"* means the installed products to be provided by SIEMENS as described in the Scope of Work and Services, Exhibit A.

*"Escalation Rate"* means an annual percentage increase to be applied to the previous year's energy savings, operational savings and service pricing, beginning and occurring on dates outlined in the Performance Assurance, Exhibit C. A different Escalation Rate may be applied to differing Savings calculations and/or payment schedules depending on the percentage agreed upon by the Parties.

*"Facility"* or *"Facilities"* means the building(s) or structure(s) where Work will be installed or implemented.

*"Facility Improvement Measures"* or *"FIMs"* means the methods, techniques, application of know-how, installation of devices or otherwise, described in the Scope of Work and Services, Exhibit A, that are undertaken by SIEMENS as a result of this Agreement with the intent of generating net savings or efficiencies at or in connection with the operation of the Facilities, including one or multiple ECMs as well as any non-conservation-related activities, means or methods.

*"FEMP"* means the Federal Energy Management Program managed by the United States Department of Energy.

*"FEMP Guidelines"* means the FEMP M&V Guidelines v. 3.0 published by FEMP as *M&V Guidelines; Measurement and Verification for Federal Energy Management Projects.*

*"Guarantee Date"* means the first day of the month following the date on which the CLIENT executes the final Certificate of Substantial Completion, thus indicating that the Construction Period is complete.

*"Guaranteed Annual Savings"* are the Guaranteed Measured & Verified Savings plus the Stipulated Savings that SIEMENS guarantees will occur in an Annual Period of the Performance Guarantee Period.

*"Guaranteed Measured & Verified Savings"* means the Measured & Verified Savings that SIEMENS guarantees will be achieved, as described in the Performance Assurance, Exhibit C.

*"Guaranteed Savings"* means the amount of Savings that SIEMENS guarantees will be achieved at the Facility during the Performance Guarantee Period. as identified in the Performance Assurance, Exhibit C as subject to the limitation identified in Section 4.8.

*"Hazardous Materials"* refers to the definition found in Section 11.1.

*"Instruments"* means all reports, notes, calculations, data, drawings, estimates, specifications, manuals, documents, all computer programs, codes and computerized materials prepared by or for SIEMENS, excluding Deliverables.

*"IPMVP"* means the International Performance Measurement and Verification Protocol, Volume 1, EVO 10000-1.2007 as prepared by the Efficiency Valuation Organization.

*"kW"* and *"kWh"* **means** kilowatt and kilowatt hour, respectively.

*"Maintenance Services Program"* or *"MSP"* means the Services performed by SIEMENS to maintain the Equipment in good working order. The MSP may also contain Services unrelated to the maintenance of the Equipment. If applicable, the MSP is more fully described in the Scope of Work and Services, Exhibit A.

*"Material Change"* means a measurable deviation in the Contracted Baseline such that there is an adverse impact on the Annual Realized Savings which results or will result in a Savings Shortfall.

*"Measured & Verified Savings"* means those Savings that can be calculated and ascertained by the methodology set forth in the Performance Assurance, Exhibit C.

## PERFORMANCE CONTRACTING AGREEMENT

*"Oil"* refers to the definition found in Section 11.1.

*"Operational Savings"* means Savings derived from reduced operational expenses, including but not limited to, Deferred Maintenance, or Capital Off-Set Savings.  Operational Savings can only be expressed in monetary value and are Stipulated Savings.

**"Parties"** means the CLIENT and SIEMENS.

*"Performance Assurance"* is the process of ascertaining whether the FIMs are performing at the level necessary to achieve the Guaranteed Savings.

*"Performance Assurance Services Program"* or **"PASP"** means the Services required to monitor the operation of the FIMs so that SIEMENS can provide the Annual Performance Assurance Report detailing the Annual Realized Savings and, where applicable, the Accumulated Realized Savings, and comparing the same to the Annual Guaranteed Savings and, where applicable, the Guaranteed Accumulated Savings based upon the calculations agreed to by the Parties in the Performance Assurance, Exhibit C. The Services provided under the PASP are described in the Scope of Work and Services, Exhibit A.

*"Performance Guarantee"* means the guarantee that SIEMENS makes to the CLIENT which is reconciled and confirmed through the Performance Assurance process set forth in the Performance Assurance, Exhibit C.

*"Performance Guarantee Period"* means the timeframe from the Guarantee Date to the last day of the final Annual Period as described in Table 1.1 of the Performance Assurance, Exhibit C, or the period from the Guarantee Date until the termination of this Agreement, whichever occurs earlier.

*"Permitted Users"* means the CLIENT, its employees and agents.

*"Savings"* means the Parties' intended result from implementing all FIMs.  Savings can be derived from reductions in energy or utility consumption, reductions in operating expenses, a changed utility rate classification or a combination thereof. The Savings that are achieved from reduced energy or utility consumption are converted to a dollar figure based upon the calculation in Article 4.1.1 and as detailed in the Performance Assurance, Exhibit C.  When converted to a dollar figure, these Savings become energy cost savings.  Operational Savings are only expressed in a dollar figure.

*"Savings Shortfall"* means the Annual Realized Savings less the Guaranteed Annual Savings for the Annual Period resulting in an amount less than zero.

*"Services"* means those services to be provided by SIEMENS as described in the Scope of Work and Services, Exhibit A.

*"Stipulated Savings"* are a sub-category of Guaranteed Savings that do not require post-FIM implementation measurement and verification because they are Operational Savings as agreed upon by the Parties based upon representations made to SIEMENS by the CLIENT.  As such, Stipulated Savings are agreed upon in advance by the Parties and cannot be changed. The Stipulated Savings for each Annual Period, along with the corresponding Escalation Rate, if applicable, are set forth in the Performance Assurance, Exhibit C.

**"Substantial Completion"** or **"Substantially Complete"** means the Work, or any identifiable portion thereof, is sufficiently complete, in accordance with the provisions of this Agreement relating to the Scope of the Work and Services, Exhibit A, such that the CLIENT will be able to realize from such Work substantially all of the practical benefits intended to be gained therefrom, or otherwise employ the Work or the FIMs for their intended purposes.  To the extent that the Work requires multiple Acceptances, the Work's final Substantial Completion date shall determine the Guarantee Date.

*"Therm"* is a measure of energy equal to 100,000 BTUs.

*"Total Guaranteed Savings"* means the sum of the Savings that are guaranteed for all Annual Periods during the Performance Guarantee Period (inclusive of the Construction Period, if applicable).  The Total Guaranteed Savings are reflected in Tables 1.1 and 1.2 in the Performance Assurance, Exhibit C.

*"Work"* means collective labor, Equipment and services comprising the FIMs to be performed by SIEMENS, as described in the Scope of Work and Services, Exhibit A.

## PERFORMANCE CONTRACTING AGREEMENT

**Article 3**
**General**

3.1 The Parties hereto acknowledge and agree that this Agreement has been negotiated at arm's length and among the Parties equally sophisticated and knowledgeable as to the subject matter of this Agreement. Each party has conferred, or has had the opportunity to confer, with their respective legal counsel.   Accordingly, in the event any claim is made relating to any conflict, omission, or ambiguity in this Agreement, no presumption, burden of proof, or persuasion shall be implied by virtue of the fact that this Agreement was drafted by or at the request of a particular party or its legal counsel.

3.2 The CLIENT hereby engages and SIEMENS hereby accepts the engagement to perform and to provide the Work and Services set forth in Exhibit A in accordance with the terms and conditions of this Agreement.

3.3 SIEMENS shall perform the Work as an independent contractor with exclusive control of the manner and means of performing the Work in accordance with the requirements of this Agreement. SIEMENS has no authority to act or make any agreements or representations on behalf of the CLIENT. This Agreement is not intended, and shall not be construed to create, between the CLIENT and SIEMENS, the relationship of principal and agent, joint-venturers, co-partners or any other such relationship, the existence of which is hereby expressly denied. No employee or agent of SIEMENS shall be, or shall be deemed to be, an employee or agent of the CLIENT.

3.4 SIEMENS represents, warrants and covenants to the CLIENT that:

    (a) It has all requisite corporate power to enter into this Agreement, and that its execution hereof has been duly authorized and does not and will not constitute a breach or violation of any of SIEMENS' organizational documents, any applicable laws or regulations, or any agreements with third parties;

    (b) It has done and will continue to do all things necessary to preserve and keep in full force and effect its existence and the Agreement;

    (c) This Agreement is the legal, valid and binding obligation of SIEMENS, in accordance with its terms, and all requirements have been met and procedures have been followed by SIEMENS to ensure the enforceability of the Agreement;

    (d) To SIEMENS' best knowledge, there is no pending or threatened, suit, action, litigation or proceeding against or affecting SIEMENS that affects the validity or enforceability of this Agreement; and,

    (e) It is duly authorized to do business in all locations where the Work and Services are to be performed.

3.5 The CLIENT represents, warrants and covenants to SIEMENS that:

    (a) It has all requisite corporate power and/or statutory authority to enter into this Agreement, and that its execution hereof has been duly authorized and does not and will not constitute a breach or violation of any of the CLIENT'S organizational documents, any applicable laws or regulations, or any agreements with third parties;

    (b) It has done and will continue to do all things necessary to preserve and keep in full force and effect its existence and the Agreement;

    (c) This Agreement is the legal, valid and binding obligation of the CLIENT, in accordance with its terms, and all requirements have been met and procedures have been followed by the CLIENT to ensure the enforceability of the Agreement;

    (d) To the CLIENT'S best knowledge, there is no pending or threatened, suit, action, litigation or proceeding against or affecting the CLIENT that affects the validity or enforceability of this Agreement; and,

    (e) The CLIENT has consulted with its legal counsel and is relying on the advice of its counsel concerning all legal issues related to this Agreement, and is not relying on SIEMENS in this regard.

**Article 4**

**Performance Guarantee**

4.1 The Annual Realized Savings generated during each Annual Period will be no less than the Guaranteed Annual Savings as shown in Tables 1.1 and 1.2 of the Performance Assurance, Exhibit C, subject to the limits in Section 4.8. The measurement and verification calculation methodology for determining the Measured & Verified Savings is set forth in the Performance Assurance, Exhibit C.

    4.1.1 General. Except as otherwise provided, energy savings will be calculated for each month of each Annual Period as the product of (a) "units of energy saved" (kWh, Therms, GJ, etc.) multiplied by (b) "cost of energy."

## PERFORMANCE CONTRACTING AGREEMENT

(a) Units of energy saved are calculated by 1) assuming the Contracted Baseline has been maintained per Section 4.3 below, and 2) subtracting the then current period measured units of energy consumed from the Baseline units of energy defined in Article 5 of Exhibit C.

(b) Costs of energy are defined in Article 6 of Exhibit C, Utility Rate Structures and Escalation Rates.

4.2 Any future escalation factors to be applied to utility, energy or other costs are set forth in Exhibit C. SIEMENS and the CLIENT agree that the Baseline data set forth in Exhibit C is a full and accurate reflection of the existing Facility, equipment, operation, business use and energy usage, and that such Baseline data will be the basis on which all future energy use will be compared in order to determine the Annual Realized Savings.

4.3 SIEMENS and the CLIENT agree that the Contracted Baseline fully described in Exhibit C will represent the new operating and/or equipment profile of the Facility resulting from the FIM implementation. The Performance Guarantee is dependent upon and is subject to the express condition that the CLIENT operates and maintains its Facilities within the Contracted Baseline parameters, as may be adjusted in accordance with the terms herein, during the entire term of the Performance Guarantee Period.

4.4 The CLIENT agrees to notify SIEMENS prior to or within 30 days of CLIENT'S knowledge of any Material Change.

4.5 Within 30 days of notice of a Material Change, SIEMENS' discovery of a Material Change, and with prompt notice to CLIENT, SIEMENS will either:

(a) Require an adjustment to the Performance Assurance and the Performance Guarantee as a result of the Material Change; or,

(b) Where a commercially reasonable adjustment to the Performance Guarantee is unavailable, terminate both the Performance Assurance and the Performance Guarantee.

4.6 Performance Guarantee Period savings reconciliation as identified in Section 4.1 will be performed at the end of each Annual Period as follows:

(a) Within ninety (90) days of the Guarantee Date, the Construction Period Savings shall be reconciled and applied to the calculation of the first Annual Period's Annual Realized Savings.

(b) At the conclusion of each Annual Period, SIEMENS will calculate the Annual Realized Savings and compare the calculated amount to the applicable Guaranteed Annual Savings amount.

(c) Where the Annual Realized Savings are less than the Guaranteed Annual Savings, a Savings Shortfall shall be recorded for the applicable Annual Period.

(d) A Savings Shortfall shall be paid by SIEMENS within sixty (60) days following the CLIENT'S acceptance of the reconciliation and once paid SIEMENS shall have fulfilled its obligations under the Performance Guarantee for the applicable Annual Period.

4.6.1 As the mutual goal of the Parties is to maximize Savings, if SIEMENS can correct a Savings Shortfall through an operational improvement at no expense or material inconvenience to the CLIENT and with no future operational expenses, and the CLIENT declines to allow such operational improvement, then any future Savings Shortfall that the improvement would have corrected will be negated by deeming the value of the Savings Shortfall as Savings achieved and adding the amount of same to the Annual Realized Savings calculations for each Annual Period thereafter.

4.7 The Performance Guarantee is dependent upon and is subject to the express condition that the CLIENT maintains the PASP during the entire Performance Guarantee Period. If the CLIENT fails to maintain, breaches, cancels or otherwise causes the termination of the PASP then; (a) The Performance Guarantee shall terminate immediately and be void and of no force or effect; or, (b) Where termination of the Performance Guarantee would render the Agreement in violation of the applicable law, all Guaranteed Savings thereafter shall be determined to have been achieved and SIEMENS shall have been deemed to have met its Performance Guarantee obligations under this Agreement for each and every Annual Period thereafter without the obligation to provide the CLIENT, or any third-party as the case may be, with any further Annual Performance Assurance Reports.

4.8 The payments and credits based on Savings Shortfalls, if any, are the sole remedy of the CLIENT for this Performance Guarantee. ANY PAYMENTS MADE OR TO BE MADE TO THE CLIENT UNDER THE TERMS OF THIS PERFORMANCE GUARANTEE SHALL NOT EXCEED THE PAYMENTS ACTUALLY MADE BY CLIENT TO EITHER SIEMENS AND/OR A THIRD-PARTY (IN THE EVENT THAT THE CLIENT HAS FINANCED THE TRANSACTION) FOR THE AGGREGATE OF: THE PRICE, AS DEFINED IN EXHIBIT B, ARTICLE 1.1; THE PASP PAYMENTS; THE MSP PAYMENTS, IF ANY; AND, IF APPLICABLE, THE CLIENT'S COST OF FINANCING THE WORK.   The

## PERFORMANCE CONTRACTING AGREEMENT

CLIENT'S cost of financing the Work is the cost of financing calculated either: (a) On the date that the escrow account is funded in accordance with Exhibit B, Article 1.2; or, (b) On the Effective Contract Date if the escrow requirement is expressly waived by SIEMENS.

4.9 The CLIENT represents that all existing equipment that is not installed by SIEMENS under this Agreement but is deemed necessary to achieve the Performance Guarantee, is in satisfactory working condition. Prior to the beginning of the Performance Guarantee Period, SIEMENS will have inspected all such existing equipment and reported any deficiencies to the CLIENT. To the extent that the deficiencies are not remedied by the CLIENT prior to the Guarantee Date, the adverse affect on the ability of the Project to attain the necessary Guaranteed Savings shall be factored into the Annual Performance Assurance Report and, if necessary, the Performance Guarantee shall be adjusted accordingly.

4.10 If the Equipment or the existing equipment is altered or moved by any person (including the CLIENT) other than SIEMENS or a person authorized by SIEMENS, the CLIENT shall immediately notify SIEMENS in writing, and SIEMENS reserves the right to perform a reacceptance test on, or if necessary a re-commissioning of, the system at the CLIENT'S expense in order to determine if a Material Change has occurred.

4.11 SIEMENS will have no liability or obligation to continue providing PASP Services or any Guaranteed Savings under the Performance Guarantee in the event that the CLIENT fails to:

    (a) Authorize a re-acceptance test or re-commissioning that SIEMENS reasonably deems necessary in order to determine if a Material Change has occurred;

    (b) Provide access to any Facility where Work is to be performed;

    (c) Service and maintain all Equipment in accordance with the manufacturers' recommendations in order to prevent a Savings Shortfall; or,

    (d) Provide SIEMENS with accurate Facility operating information as soon as such information becomes reasonably available to the CLIENT, including energy usage and cost, executed preventive maintenance and repair records, building or equipment additions, and occupancy levels during each Annual Period.

4.12 Unless expressly contrary to law, should the CLIENT decide to discontinue the PASP before the end of the Performance Guarantee Period, the CLIENT will give SIEMENS thirty (30) days prior written notice and in such notice indicate that the CLIENT has selected one of the following:

    (a) The CLIENT will re-invest the avoided cost of cancellation of the PASP into Facility improvements and services that improve the overall Facility's performance and which improvements and services are implemented by SIEMENS; or,

    (b) The CLIENT will pay to SIEMENS 25% of the remaining value left in the PASP Annual Period, as a liquidated damage and not as a penalty, to compensate SIEMENS for SIEMENS' up-front costs and expenses in preparing to perform the PASP as contracted for the Annual Period.

4.13 Unless expressly contrary to law, any disputes concerning the calculation of the Annual Realized Savings or changes to the Contracted Baseline that are not resolved by negotiation between the Parties within thirty (30) days of the notice of the dispute, will be resolved by a third-party professional engineering firm which is reasonably acceptable to both SIEMENS and the CLIENT. The determination of such firm will be final and binding upon CLIENT and SIEMENS. SIEMENS and the CLIENT will each be responsible for half of the fees of such firm.

## Article 5
### Work by SIEMENS

5.1 SIEMENS will perform the Work expressly described in this Agreement and in any work release documents or change orders that are issued under this Agreement and signed by both Parties. The Work performed by SIEMENS shall be conducted in a workmanlike manner.

5.2 SIEMENS shall perform the Work during its normal hours, Monday through Friday inclusive, excluding holidays, unless otherwise agreed herein. The CLIENT shall make the Facility available so Work may proceed in an efficient manner.

5.3 SIEMENS is not required to conduct safety, reacceptance or other tests, install new devices or equipment or make modifications to any Equipment unless expressly made a part of the Work identified in the Scope of Work and Services, Exhibit A. Any CLIENT request to change the scope or the nature of the Work or Services must be in the form of a mutually agreed change order, effective only when executed by the Parties.

    

## PERFORMANCE CONTRACTING AGREEMENT

5.4 All Deliverables shall become the CLIENT'S property upon receipt by CLIENT. SIEMENS may retain file copies of such Deliverables. All Instruments shall remain SIEMENS' property. All Deliverables and Instruments provided to the CLIENT are for Permitted Users' use and only for the purposes disclosed to SIEMENS. To the extent specified in Exhibit A, Permitted Users shall have a right to make and retain copies of Instruments except uncompiled code, and to use all Instruments; provided, however, that the Instruments shall not be used or relied upon by any parties other than Permitted Users, and such use shall be limited to the particular project and location for which the Instruments were provided. The CLIENT shall not transfer any Deliverables or copies of Instruments to others or use them or permit them to be used for any extension of the Work or any other project or purpose without SIEMENS' express written consent. Any reuse of Deliverables or Instruments for other projects or locations without the written consent of SIEMENS, or use other than by Permitted Users, will be at Permitted Users' and such other user's sole risk and without liability to SIEMENS; and, unless expressly prohibited by law, the Permitted Users, jointly and severally, shall indemnify, defend and hold SIEMENS harmless from any claims, losses or damages arising from such unauthorized use.

5.5 SIEMENS shall be responsible for any portion of the Work performed by any subcontractor of SIEMENS. SIEMENS shall not have any responsibility, duty or authority to direct, supervise or oversee any contractor of the CLIENT or their work or to provide the means, methods or sequence of their work or to stop their work. SIEMENS' work and/or presence at the Facility shall not relieve others of their responsibility to the CLIENT or to others.

5.6 SIEMENS warrants that:

    (a) Unless otherwise agreed, all Equipment shall be new and of good quality. Until one year from the date the Equipment is installed, all Equipment manufactured by SIEMENS or bearing its nameplate will be free from defects in material and workmanship arising from normal use and service.

    (b) Labor for all Work, excluding PASP or MSP Services, is warranted to be free from defects in workmanship for one year after the Work is performed. PASP Services and MSP Services are warranted to be free from defects in workmanship for ninety (90) days after the Services are performed.

5.7 Warranty Limitation:

    (a) The limited warranties set forth in Section 5.6 will be void as to, and shall not apply to, any Equipment (i) repaired, altered or improperly installed by any person other than SIEMENS or its authorized representative; (ii) which the CLIENT or a third party subjects to unreasonable or improper use or storage, uses beyond rated conditions, operates other than per SIEMENS' or the manufacturer's instructions, or otherwise subjects to improper maintenance, negligence or accident; (iii) damaged because of any use of the Equipment after the CLIENT has, or should have had, knowledge of any defect in the Equipment; or (iv) not manufactured, fabricated and assembled by SIEMENS or not bearing SIEMENS' nameplate. However, SIEMENS assigns to the CLIENT, without recourse, any and all assignable warranties available from any manufacturer, supplier, or subcontractor of such Equipment.

    (b) Any claim under the limited warranty granted above must be made in writing to SIEMENS within thirty (30) days after discovery of the claimed defect unless discovered directly by SIEMENS. Such limited warranty only extends to the CLIENT and not to any subsequent owner of the Equipment. The CLIENT'S sole and exclusive remedy for any Equipment or Services not conforming with this limited warranty is limited to, at SIEMENS' option: (i) repair or replacement of defective components of covered Equipment; (ii) re-performance of the defective portion of the Services; or (iii) to the extent previously paid and itemized, the issuance of a credit or refund for the original purchase price of such defective component or portion of the Equipment or Services.

    (c) SIEMENS shall not be required to repair or replace more than the component(s) of the Equipment or the portion of the Work and Services actually found to be defective. SIEMENS' warranty liability shall not exceed the purchase price of such item. Repaired or replaced Equipment or Services will be warranted hereunder only for the remaining portion of the original warranty period.

5.8 THE EXPRESS LIMITED WARRANTIES PROVIDED ABOVE ARE IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES, STATUTORY, EXPRESS, OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH ARE HEREBY EXPRESSLY DISCLAIMED. THE LIMITED EXPRESS WARRANTIES AND REPRESENTATIONS SET FORTH IN THIS AGREEMENT MAY ONLY BE MODIFIED OR SUPPLEMENTED IN A WRITING EXECUTED BY A DULY AUTHORIZED SIGNATORY OF EACH PARTY.

## PERFORMANCE CONTRACTING AGREEMENT

5.9  SIEMENS will not be responsible for the maintenance, repair or replacement of, or Services necessitated by reason of:

    (a)  Non-maintainable, non-replaceable or obsolete parts of the Equipment, including but not limited to: ductwork, shell and tubes, heat exchangers, coils, unit cabinets, casings, refractory material, electrical wiring, water and pneumatic piping, structural supports, cooling tower fill, slats and basins, etc., unless covered by the warranty provisions herein or otherwise specifically stated herein; or

    (b)  CLIENT'S or a third-party's negligence, abuse, misuse, improper or inadequate repairs or modifications, improper operation, lack of operator maintenance or skill, corrosion, erosion, improper or inadequate water treatment, electrolytic action, chemical action, failure to comply with manufacturer's operating and environmental requirements, Acts of God, or other reasons beyond SIEMENS' control. Unless expressly agreed in writing, SIEMENS is not responsible for the removal or reinstallation of replacement valves, dampers, or waterflow and tamper switches with respect to pipes and ductwork, including vent or drain system. SIEMENS ASSUMES NO RESPONSIBILITY FOR ANY SERVICE PERFORMED ON ANY EQUIPMENT OTHER THAN THAT PERFORMED BY SIEMENS OR ITS AGENTS.

## Article 6
## The CLIENT'S Responsibilities

6.1  The CLIENT, without cost to SIEMENS, shall:

    (a)  Designate a contact person with authority to make decisions for the CLIENT regarding the Work and provide SIEMENS with information sufficient to contact such person in an emergency;

    (b)  Coordinate the work of contractors under CLIENT'S sole control so as not to disrupt the Work and Services proceeding in an efficient manner;

    (c)  Provide or arrange for 24 hour, 7 day per week access and make all reasonable provisions for SIEMENS to enter any Facility where Work is to be performed so that Work may proceed in an efficient manner;

    (d)  Permit SIEMENS to control and/or operate all building controls, systems, apparatus, equipment and machinery necessary to perform the Work;

    (e)  Furnish SIEMENS with blueprints, surveys, legal descriptions, waste management plans and all other available information pertinent to the Work and any Facility where the Work is to be performed as may be reasonably requested by SIEMENS. Such plans and blueprints, along with an executed copy of this Agreement, with its Exhibits, shall be kept and maintained in CLIENT'S files for a period of fifteen (15) years from the Effective Contract Date;

    (f)  Furnish SIEMENS with all approvals, permits and consents from government authorities and others as may be required for performance of the Work, except for those SIEMENS has expressly agreed in writing to obtain;

    (g)  In accordance with Article 11 hereof, promptly notify SIEMENS of all known or suspected Hazardous Materials at the Facility, of any contamination of the Facility by Oil or Hazardous Material, and of any other conditions requiring special care or which may reasonably be expected to affect the Work, and provide SIEMENS with any available documents describing the quantity, nature, location and extent of such materials, contamination or conditions;

    (h)  Comply with all laws and provide any notices required to be given to any government authorities in connection with the Work, except such notices SIEMENS has expressly agreed in writing to give;

    (i)  Provide SIEMENS with legally required materials and information (including but not limited to Material Safety Data Sheets) related to all Hazardous Materials located at any Facility where the Work is to be performed;

    (j)  Furnish SIEMENS with any contingency plans, safety programs and other policies, plans or programs related to any Facility where the Work is to be performed;

    (k)  Operate, service and maintain all Equipment according to the manufacturer's recommendations including those set forth in the manufacturer's operating manuals or instructions, as well as all requirements of applicable law or of authorities having jurisdiction. The CLIENT shall furnish all needed servicing and parts for said FIMs, which parts shall become part of the FIMs. Such Equipment shall be operated only in the specified operating environment, which shall be supplied by the CLIENT, including without limitation: (1) suitable electrical service, including clean, stable, properly conditioned power, to all Equipment; (2) telephone lines, capacity and connectivity as required by such Equipment; and (3) heat, light, air conditioning or other environmental controls, and other utilities in accordance with the specifications for the Equipment;

## PERFORMANCE CONTRACTING AGREEMENT

(l)   Promptly notify SIEMENS of any unusual operating conditions, hours of usage, system malfunctions, installed equipment or building alterations that may affect the Equipment or energy usage or any Services; and,

(m)   If applicable, provide and pay for a dedicated voice grade dial-up phone line, or a mutually agreed communication method, and install a terminal block, or an equivalent communication mechanism, in a mutually agreed upon location. All on-line service Equipment (excluding the phone line) will remain the property of SIEMENS unless otherwise stated herein.

6.2   The CLIENT acknowledges that the technical and pricing information contained in this Agreement is confidential and proprietary to SIEMENS and agrees not to disclose it or otherwise make it available to others except as required by law or SIEMENS express written consent.

6.3   The CLIENT acknowledges that it is now and shall at all times remain in control of the Facility. Except as expressly provided herein, SIEMENS shall not be responsible for the adequacy of the health or safety programs or precautions related to the CLIENT'S activities or operations, the CLIENT'S other contractor(s), the work of any other person or entity, or Facility conditions. SIEMENS shall not be responsible for inspecting, observing, reporting or correcting health or safety conditions or deficiencies of the CLIENT or others at the Facility. So as not to discourage SIEMENS from voluntarily addressing health or safety issues while at the Facility, in the event SIEMENS does address such issues by making observations, reports, suggestions or otherwise, the CLIENT shall not hold, or attempt to hold, SIEMENS liable or responsible on account thereof.

## Article 7
### Changes and Delays

7.1   As the Work is performed, existing laws or conditions may change, or circumstances outside SIEMENS' reasonable control may develop, which would require SIEMENS to expend additional costs, effort or time to complete the Work, in which case SIEMENS will notify the CLIENT and an equitable adjustment will be made to SIEMENS' compensation and the time for performance. In the event such changes require the Work to be suspended or terminated, SIEMENS shall be compensated for Work previously performed and for costs reasonably incurred in connection with the suspension or termination.

7.2   Either party may request additions, deletions, modifications or changes to the Work. Any such requests shall only become effective upon execution of a written agreement by authorized representatives of both Parties.

7.3   SIEMENS may, in its sole discretion, substitute alternative parts, goods or equipment in the performance of the Work, provided that any such substitution shall be of an equal or better quality.

7.4   SIEMENS shall not be responsible for loss, delay, injury, damage or failure of performance that may be caused by circumstances beyond its control, including but not restricted to acts or omissions by the CLIENT or its employees, agents or contractors, Acts of God, war, civil commotion, acts or omissions of government authorities, fire, theft, corrosion, flood, water damage, lightning, freeze-ups, strikes, lockouts, differences with workmen, riots, explosions, quarantine restrictions, delays in transportation, or shortage of vehicles, fuel, labor or materials. In the event of such delay or failure, the time for performance shall be extended by a period equal to the time lost plus a reasonable recovery period and the compensation shall be equitably adjusted to compensate for additional costs SIEMENS incurs due to such delay. If any such delay exceeds sixty (60) days, SIEMENS may terminate this Agreement upon three (3) days notice to the CLIENT and the CLIENT shall promptly pay SIEMENS for the allocable portion of the Work completed, for any costs and expenses of termination, and for any loss or damage incurred with respect to materials, equipment, tools and machinery, including reasonable overhead and profit.

## Article 8
### Compensation

8.1   The aggregate amount paid by CLIENT provides for and is solely in consideration of the Scope of Work and Services described in Exhibit A, and is detailed in Exhibit B.

8.2   SIEMENS will invoice the CLIENT in accordance with the schedules set forth in Exhibit B. Unless otherwise agreed in writing, invoices are due and payable upon receipt by the CLIENT. If the CLIENT disagrees with any portion of an invoice, it shall notify SIEMENS in writing of the amount in dispute and the reason for its disagreement within 21 days of receipt of the invoice, and shall pay the portion not in dispute.

## PERFORMANCE CONTRACTING AGREEMENT

8.3   SIEMENS may suspend or terminate the Work or Services at any time if payment is not received when due.  In such event, SIEMENS shall be entitled to compensation for the Work or Services previously performed and for costs reasonably incurred in connection with the suspension or termination.

8.4   On amounts not paid within thirty (30) days of invoice date, the CLIENT shall pay interest from invoice date until payment is received at the lesser of 12% per annum or the maximum rate allowed by law. The CLIENT shall reimburse SIEMENS for SIEMENS' costs and expenses (including reasonable attorney and witness fees) incurred for collection under this Agreement.

8.5   Except to the extent expressly agreed herein, SIEMENS' fees do not include any taxes, excises, fees, duties or other government charges related to the Work or Services.  The CLIENT shall pay such amounts or reimburse SIEMENS for any such amounts SIEMENS pays to the extent such charges are lawfully due and payable by CLIENT and have been paid or incurred by SIEMENS in furtherance thereof. If the CLIENT claims that the Work or Services is subject to a tax exemption or direct payment permit, it shall provide SIEMENS with a valid exemption certificate or permit and, unless specifically prohibited by law, shall indemnify, defend and hold SIEMENS harmless from any taxes, costs and penalties arising out of the use or acceptance of same.

8.6   All other work or services requested by the CLIENT, including but not limited to the following, shall be separately billed or surcharged on a time and materials basis:

    (a)   Emergency services, if inspection does not reveal any deficiency covered by the Scope of Work and Services, Exhibit A;

    (b)   Work and/or services performed at times other than during SIEMENS' normal working hours, unless otherwise agreed to in Exhibit A; or

    (c)   Work and/or services performed on equipment not covered by the Scope of Work and Services, Exhibit A.

## Article 9

**Acceptance**

9.1   When SIEMENS believes that all, or an independent, definable phase or portion, of the Work is Substantially Complete, SIEMENS will submit a Certificate of Substantial Completion to the CLIENT which shall be subject to the following:

    (a)   If the CLIENT concurs that the described portion of the Work as performed is Substantially Complete, the CLIENT will accept that Work by signing the Certificate of Substantial Completion and returning it to SIEMENS;

    (b)   If the CLIENT does not concur that the Work is Substantially Complete, then the CLIENT shall notify SIEMENS within fourteen (14) business days of any discrepancies;

    (c)   To the extent SIEMENS does not dispute the discrepancies raised by the CLIENT, SIEMENS shall correct the Work to conform to the description of the Work set forth herein, and resubmit the Certificate of Substantial Completion to the CLIENT;

    (d)   If SIEMENS disagrees with the discrepancies raised by the CLIENT, SIEMENS shall notify the CLIENT of a dispute and such dispute shall be resolved in accordance with Section 9.3 herein;

    (e)   If the CLIENT Representative does not deliver written notice to SIEMENS within five (5) business days of receiving the Certificate of Substantial Completion, in the mutual interests of the Project proceeding in a timely manner, the CLIENT will be deemed to have agreed to, signed and returned the Certificate of Substantial Completion.

9.2   To the extent that this Project requires multiple Certificates of Substantial Completion, the final Certificate of Substantial Completion shall determine the date on which the Construction Period is completed.

9.3   Any disputes concerning the Substantial Completion of the Work will be resolved by submitting the issue to a third party professional engineering firm and which is reasonably acceptable to both SIEMENS and the CLIENT. The determination of this firm with respect to completion or Substantial Completion will be final and binding upon the Parties. SIEMENS and the CLIENT shall share equally the costs or fees for such firm in connection with such dispute resolution process.

## Article 10

**Insurance and Allocation of Risk**

10.1 SIEMENS shall maintain, at SIEMENS' expense, the following insurances while performing the Work and shall add the CLIENT as an "Additional Insured" to each policy that is referenced in subsections (c) through and including (e) hereof:

## PERFORMANCE CONTRACTING AGREEMENT

(a) Workers' Compensation at the statutory amounts and limits as prescribed by applicable law.

(b) Employer's Liability insurance (and, where applicable, Stop Gap extended protection endorsement) limits of liability shall be:

- $1,000,000 per occurrence
- $1,000,000 Disease Policy
- $1,000,000 Each Employee

(c) SIEMENS shall carry, in the Occurrence Coverage Form, Comprehensive General Liability or Commercial General Liability, insurance covering SIEMENS' operations and providing insurance for bodily injury and property damage with limits of liability stated below and including coverage for:

- Products and Completed Operations
- Contractual Liability insuring the obligations assumed by SIEMENS in this Agreement
- Broad Form Property Damage (including Completed Operations)
- Explosion, Collapse and Underground Hazards
- Personal Injury Liability:
  — Limits of liability shall be $1,000,000 per occurrence/aggregate

(d) SIEMENS shall carry Automobile Liability Insurance in the Occurrence Coverage Form covering all owned, hired and non-owned automobiles and trucks used by or on behalf of SIEMENS providing insurance for bodily injury liability and property damage liability for the limits of:

- $1,000,000 per occurrence/aggregate

(e) SIEMENS shall carry Excess Liability Insurance in the Occurrence Coverage Form with limits of:

- $5,000,000 per occurrence/aggregate

10.2 The CLIENT will either maintain at its own expense, or self-insure for the equivalent risks, property insurance written on a builder's "all-risk" or equivalent policy form in an amount no less than the Price identified in Exhibit B, Article 1.1, plus the value of subsequent modifications and cost of materials supplied or installed by others, on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by SIEMENS, until final payment has been made to SIEMENS or no person or entity other than the CLIENT has an insurable interest in the property, whichever is later. The policy form shall include without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and start-up, rebuilding and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for SIEMENS' services and expenses required as result of such insured loss. If the insurance requires deductibles or retentions, the CLIENT shall pay costs not covered because of such deductibles or retentions. This insurance shall cover portions of the Work off the Facility, and also portions of the Work in transit. Partial occupancy or use shall not commence unless the insurance company providing this insurance has consented to such partial occupancy or use by endorsement for otherwise. The CLIENT shall purchase and maintain boiler and machinery insurance which shall specifically cover such insured objects during installation and until Acceptance by the CLIENT. The insurance required by this section shall include the interests of the CLIENT, SIEMENS, subcontractor and sub-subcontractor in the Work. SIEMENS shall be included as an additional insured on each such insurance coverage. The CLIENT and SIEMENS waive all rights against each other and any of their subcontractors, sub-subcontractors, agents and employees for damages caused by fire or other causes of loss to the extent covered by the insurance required by this section and for any other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the CLIENT as fiduciary. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged. Insurance certificates shall be furnished upon request.

10.3 Title and risk of loss of materials and Equipment furnished by SIEMENS shall pass to the CLIENT upon their delivery to the Facility, and the CLIENT shall be responsible for protecting them against theft and damage.

10.4 SIEMENS will indemnify the CLIENT from and against losses, claims, expenses and damages (including reasonable attorney's fees) for personal injury or physical damage to property (collectively "Damages"). Such indemnification shall be solely to the extent the Damages are caused by or arise directly from SIEMENS or its employees', consultants' or agents' negligent acts or omissions or willful misconduct in connection with SIEMENS' performance of the Work or

## PERFORMANCE CONTRACTING AGREEMENT

Services. SIEMENS' obligations under this indemnity shall not extend to Damages arising out of or in any way attributable to the negligence of the CLIENT or its agents, contractors or employees. SIEMENS reserves the right to control the defense and settlement of any claim for which SIEMENS has an obligation to indemnify hereunder. UNLESS CONTRARY TO APPLICABLE LAW, IN NO EVENT SHALL THE CLIENT OR SIEMENS BE LIABLE UNDER THIS INDEMNITY OR OTHERWISE UNDER THIS AGREEMENT FOR SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES, INCLUDING COMMERCIAL LOSS, LOSS OF USE, OR LOST PROFITS, HOWEVER CAUSED, EVEN IF SIEMENS OR THE CLIENT HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND, IN ANY EVENT, UNLESS CONTRARY TO APPLICABLE LAW, SIEMENS' AGGREGATE LIABILITY FOR ANY AND ALL CLAIMS, LOSSES OR EXPENSES ARISING OUT OF THIS AGREEMENT, OR OUT OF ANY GOODS OR SERVICES FURNISHED UNDER THIS AGREEMENT, WHETHER BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, AGENCY, WARRANTY, TRESPASS, INDEMNITY OR ANY OTHER THEORY OF LIABILITY, SHALL BE LIMITED TO THE LESSER OF $1,500,000 OR THE TOTAL COMPENSATION RECEIVED BY SIEMENS FROM THE CLIENT UNDER THIS AGREEMENT. The preceding limit shall not apply to the CLIENT'S remedy under the Performance Guarantee as such is limited by Section 4.8.

10.5 As to Patents and Copyrights:

    (a) SIEMENS will, at its own expense, defend or at its option settle any suit or proceeding brought against the CLIENT in so far as it is based on an allegation that any Work (including parts thereof), or use thereof for its intended purpose, constitutes an infringement of any United States patent or copyright, if SIEMENS is promptly provided notice and given authority, information, and assistance in a timely manner for the defense of said suit or proceeding. SIEMENS will pay the damages and costs awarded in any suit or proceeding so defended. SIEMENS will not be responsible for any settlement of such suit or proceeding made without its prior written consent. In case the Work, or any part thereof, as a result of any suit or proceeding so defended is held to constitute infringement or its use by the CLIENT is enjoined, SIEMENS will, at its option and its own expense, either: (i) procure for the CLIENT the right to continue using said Work; (ii) replace it with substantially equivalent non-infringing Work; or (iii) modify the Work so it becomes non-infringing.

    (b) SIEMENS will have no duty or obligation to the CLIENT under Section 10.5(a) to the extent that the Work is: (i) supplied according to the CLIENT'S design or instructions, wherein compliance therewith has caused SIEMENS to deviate from its normal course of performance; (ii) modified by the CLIENT or its contractors after delivery; or, (iii) combined by the CLIENT or its contractors with items not furnished hereunder, and by reason of said design, instruction, modification, or combination, a suit is brought against the CLIENT. If by reason of such design, instruction, modification or combination, a suit or proceeding is brought against SIEMENS, unless expressly prohibited by law, the CLIENT shall protect SIEMENS in the same manner and to the same extent that SIEMENS has agreed to protect the CLIENT under the provisions of Section 10.5(a) above.

    (c) THIS SECTION 10.5 IS AN EXCLUSIVE STATEMENT OF ALL THE DUTIES OF THE PARTIES RELATING TO PATENTS AND COPYRIGHTS, AND DIRECT OR CONTRIBUTORY PATENT OR COPYRIGHT AND OF ALL THE REMEDIES OF THE CLIENT RELATING TO ANY CLAIMS, SUITS, OR PROCEEDINGS INVOLVING PATENTS AND COPYRIGHTS. Compliance with Section 10.5 as provided herein shall constitute fulfillment of all liabilities of the Parties under the Agreement with respect to the intellectual property indemnification.

10.6 The Parties acknowledge that the price for which SIEMENS has agreed to perform the Work and obligations under this Agreement was calculated based upon the foregoing allocations of risk, and that each Party has expressly relied on and would not have entered into this Agreement but for such allocations of risk.

**Article 11**

**Hazardous Materials Provisions**

11.1 The Work does not include directly or indirectly performing or arranging for the detection, testing, handling, storage, removal, treatment, transportation, disposal, monitoring, abatement or remediation of any contamination of any Facility at which Work is performed and any soil or groundwater at the Facility by petroleum or petroleum products (collectively called "Oil"), asbestos, PCBs or hazardous, toxic, radioactive or infectious substances, including any substances regulated under RCRA, CERCLA or any other federal, state or local environmental laws, regulations, statutes, rules, standards or ordinances (collectively called "Hazardous Materials"), including without limitation: ionization smoke detectors, ballasts, mercury bulb thermostats, used oil, contaminated filters, contaminated absorbents, and refrigerant. Except as expressly disclosed pursuant to Section 11.2, the CLIENT represents and warrants that, to the best of its

## PERFORMANCE CONTRACTING AGREEMENT

knowledge following due inquiry, there are no Hazardous Materials or Oil present where the Work is to be performed. SIEMENS will notify the CLIENT immediately if it discovers or reasonably suspects the presence of any previously undisclosed Oil or Hazardous Material. All Services have been priced and agreed to by SIEMENS in reliance on the CLIENT'S representations as set forth in this Article. The discovery or reasonable suspicion of Hazardous Materials or hazardous conditions at a Facility where SIEMENS is to perform Work, or of contamination of the Facility by Oil or Hazardous Materials not previously disclosed pursuant to Section 11.2, shall entitle SIEMENS to suspend the Work immediately, subject to mutual agreement of terms and conditions applicable to any further Work, or to terminate the Work and to be paid for Work previously performed.

11.2 The CLIENT warrants that, prior to the execution of the Agreement, it notified SIEMENS in writing of any and all Oil or Hazardous Materials, to the best of its knowledge following due inquiry, known to be present, potentially present or likely to become present at the Facility and provided a copy of any Facility safety policies and information, including but not limited to lock-out and tag procedures, chemical hygiene plan, material safety data sheets, and other items covered or required to be disclosed or maintained by federal, state, or local laws, regulations or ordinances.

11.3 Regardless of whether Oil or Hazardous Material was disclosed pursuant to Section 11.2, the CLIENT shall be solely responsible for properly testing, abating, encapsulating, removing, disposing, remedying or neutralizing such Oil or Hazardous Materials, and for the costs thereof. Even if an appropriate change order has been entered into pursuant to Section 11.1, SIEMENS shall have the right to stop the Work until the Facility is free from Oil or Hazardous Materials. In such event, SIEMENS will receive an equitable extension of time to complete the Work, and compensation for delays caused by Oil or Hazardous Materials remediation. In no event shall SIEMENS be required or construed to take title, ownership or responsibility for such Oil or Hazardous Materials. The CLIENT shall sign any required waste manifests in conformance with all government regulations, listing the CLIENT as the generator of the waste. If someone other than the CLIENT is the generator of the waste, the CLIENT shall arrange for such other person to sign such manifests.

11.4 Except where expressly prohibited by law, for separate consideration of $10 and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the CLIENT shall indemnify, defend and hold SIEMENS harmless from and against any damages, losses, costs, liabilities or expenses (including attorneys' fees) arising out of any Oil or Hazardous Materials or from the CLIENT'S breach of, or failure to perform its obligations under this Article.

11.5 For purposes of this Article 11, in the context of the phrase "to the best of its knowledge following due inquiry"; "knowledge" means actual awareness of the facts by the CLIENT'S directors, officers, employees or agents, or the presence of relevant information contained in the CLIENT'S books or records; and, "due inquiry" means inquiry of those persons under the CLIENT'S control who should have knowledge of the subject matter of such inquiry.

## Article 12
### Miscellaneous Provisions

12.1 Notices between the Parties shall be in writing and shall be hand-delivered or sent by certified mail, express courier, or acknowledged telefax properly addressed to the appropriate party. Any such notice shall be deemed to have been received when delivered in-person or when sent by telefax, or five (5) business days subsequent to deposit in the U.S. mails, or one (1) day after deposit with express courier.

12.2 Neither the CLIENT nor SIEMENS shall assign or transfer any rights or obligations under this Agreement, except that either party may assign this Agreement to its affiliates and SIEMENS may use subcontractors in the performance of the Work or Services. Nothing contained in this Agreement shall be construed to give any rights or benefits to anyone other than the CLIENT and SIEMENS without the express written consent of both Parties.

12.3 This Agreement shall be governed by and construed in accordance with the laws of the state or commonwealth within which the Facilities are located.

12.4 This Agreement and all provisions of this Agreement allocating responsibility or liability between the Parties shall survive the completion of the Work, the Services, and the termination of this Agreement.

12.5 Unless contrary to applicable law and with the exception of disputes arising under Article 4 or Article 9, any a claims, disputes or other matters in question between the Parties to this Agreement or breach thereof, shall be resolved through legal or equitable proceedings before the Court of Common Pleas of Allegheny County and/or the United States District Court for the Western District of Pennsylvania. Notwithstanding the foregoing such claims, disputes or other matters in question may be submitted to mediation and/or arbitration upon the mutual consent of the Parties.

## PERFORMANCE CONTRACTING AGREEMENT

12.6 SIEMENS' performance of the Work and Services is expressly conditioned on the Parties assenting to all of the terms of this Agreement, notwithstanding any different or additional terms contained in any writing at any time submitted or to be submitted by a Party to the other Party relating to the Work or Services, even if signed by the Parties, unless the written statement expressly indicates that such terms supersede the terms of this Agreement

12.7 Any provision of this Agreement found to be invalid, unlawful or unenforceable by a court of law shall be ineffective to the extent of such invalidity, and deemed severed herefrom, without invalidating the remainder of this Agreement. All other provisions hereof shall remain in full force and effect.

12.8 The waiver by a party of any breach by the other party of any term, covenant or condition hereof shall not operate as a waiver of any subsequent breach hereof. No waiver shall operate or be effective unless made in writing and executed by the party to be bound thereby.

12.9 In the event that the applicable law or the CLIENT requires that SIEMENS procure a performance bond and/or a payment bond, SIEMENS shall provide a performance and payment bond in the amount of $1,603,150.   The performance and payment bond will solely apply to the Work performed during the Construction Period and to the required statutory lien filing period thereafter. The performance and payment bond will not apply to any of the obligations included in the Performance Assurance, Exhibit C.  Furthermore, the CLIENT'S funding source may be named as "Co-Obligee" on the performance bond if so requested by the CLIENT.


**Article 13**

**Maintenance Services Program**

13.1 If applicable, the scope of Services provided by SIEMENS for the Maintenance Services Program is stated in Exhibit A.

13.2 The CLIENT represents that all equipment not installed by SIEMENS under this Agreement and subject to a MSP is in satisfactory working condition. SIEMENS will have inspected all such equipment within the first thirty (30) days of MSP commencement or no later than the first scheduled inspection. Testing and inspection will not be deemed to be complete until all such equipment has been so tested and inspected.

13.3 If the equipment is altered or moved by any person, including the CLIENT, other than SIEMENS or a person authorized by SIEMENS, the CLIENT shall immediately notify SIEMENS in writing, and SIEMENS reserves the right to perform a reacceptance test on, or if necessary a re-commissioning of, the system at the CLIENT'S expense.

13.4 If SIEMENS reasonably determines as a result of such inspection and/or testing that any equipment requires repair or replacement, the CLIENT will be so notified and shall take corrective action within thirty (30) days, or such equipment shall be removed from coverage hereunder without further action by the Parties. SIEMENS is not liable or responsible for the continued testing, maintenance, repair, replacement or operating capabilities of any portion of the equipment until it has been inspected and/or tested and has been, if necessary, restored to an acceptable initial condition at the CLIENT'S sole expense. Any services provided by SIEMENS in the course of such restoration will be separately charged on a time and materials basis, and not included in fees paid hereunder. If individual items of equipment cannot, in SIEMENS' sole determination, be properly repaired or replaced due to age, obsolescence, lack of availability of refrigerant gas, halon gas, necessary parts, materials, compatibility or otherwise, or as a result of excessive wear or deterioration, SIEMENS may, within ten (10) days of such inspection, give written notice that it is withdrawing such items from coverage under the MSP and adjust the MSP payments due hereunder accordingly.

13.5 If the removal of equipment from coverage would compromise or impair the integrity of the Work, Services or compliance with law of any system, then SIEMENS will provide a written statement thereof for execution by the CLIENT. The CLIENT'S failure to execute such statement within ten (10) days will void the MSP and release SIEMENS from any further obligations with respect to the MSP.

13.6 If the MSP scope of Services provides for equipment maintenance, repairs and/or replacements of equipment by SIEMENS, those Services are limited to restoring the proper working condition of such equipment. SIEMENS will not be obligated to provide replacement equipment that represents significant capital improvement compared to the original. Exchanged components become the property of SIEMENS, except Hazardous Materials, which under all circumstances remain the property and responsibility of the CLIENT.

Exhibit A - Scope of Work and Services
Eastern Area Special Schools Joint Committee

*The following Articles and Appendices are attached and made part of this Exhibit A for this Performance Contracting Agreement.*

|            |                                                          |
|------------|----------------------------------------------------------|
| Article 1  | Scope of FIM Work                                        |
| Article 2  | FIM Work Implementation Period                           |
| Article 3  | Scope of Performance Assurance Technical Support Program |
| Article 4  | Scope of Maintenance Services Technical Support Program  |
| Appendix 1 | Detailed Lighting Audit                                  |

## Article 1: Scope of Work

1.1   *Description*: Except as otherwise expressly provided herein, SIEMENS shall provide each and every item of cost and expense necessary for:

Development, design and provision of all required labor, material and equipment for the installation of the Facility Improvement Measures (FIMs) and associated work and cost items listed in Article 1.2, Specific Elements.

1.2   *Specific Elements*: The Work shall include the following:

### 1.2.1   Lighting Retrofit/Upgrade

SIEMENS shall provide all material, components and labor for the lighting retrofit/upgrade of existing lighting systems in accordance with the detailed lighting audit attached as Exhibit A, Appendix 1.

- One thousand, two hundred and ten (1,210), four-foot, two-lamp, 40 watt T12 fluorescent fixtures will be retrofit with 28-watt T8 lamps and electronic ballasts.

- Sixty-one (61) eight foot four-lamp 40 watt T12 fixtures will be retrofitted with 28-watt T8 lamps and electronic ballasts.

- Fourteen (14) four-lamp 40 watt fixtures will be retrofitted with 28-watt T8 lamps and electronic ballasts.

- Thirteen (13) one-lamp 30 watt T12 fluorescent fixtures will be retrofit with 25-watt T8 lamps and electronic ballasts.

- Forty-one (41) 110 watt eight-foot Industrial strip fixtures will be retrofitted with retrofit kits and 28-watt T8 lamps and electronic ballasts.

- Twenty (20) 70 watt exterior canopy fixtures will be retrofitted with 2-23-watt fluorescent lamps and sockets per fixture.

- Thirty-two (32) eight foot 2-Lamp fixtures in the gymnasium will be replaced with 6-Lamp T8 fixtures.

- Additional wiring will be installed for the new gymnasium fixtures to provide two level lighting.

- Four (4) occupancy sensors will be installed to control operation of gymnasium fixtures.

- Sixty-one (61) ceiling mount dual technology occupancy sensors will be installed to control lighting in class rooms, meeting rooms, and hallways.

Exhibit A - Scope of Work and Services
Eastern Area Special Schools Joint Committee

- Twenty (20) switch replacement style dual technology occupancy sensors will be installed to control lighting in small office areas.

- Thirteen (13) 25 watt incandescent lamps will be replaced with 13 watt screw-in compact fluorescent lamps.

- Twelve (12) 60 watt incandescent lamps will be replaced with 13 watt screw-in compact fluorescent lamps.

- Eight (8) 75 watt incandescent lamps will be replaced with 23 watt screw-in compact fluorescent lamps.

- Fifty-nine (59) 67 watt incandescent lamps will be replaced with 23 watt screw-in compact fluorescent flood lamps.

- One (1) occupancy sensor will be installed on the beverage vending machine located in the lounge.

**The following notes, inclusions and exclusions shall apply:**

- Existing light levels will be maintained or improved.

- Painting or other touchup required to cover the footprint left by replacing a larger fixture with a smaller fixture is not included.

- Repair of existing electrical code violations or electrical system deficiencies is not included.

- Light levels, light quality and energy savings are directly related to the various components installed in this project. Functionally identical replacement components must be used when maintaining the systems.

- All dimming fluorescent systems are considered out of scope.

- Maintenance stock is not included.

- Asbestos testing and abatement is not included.

Siemens Industry, Inc., Building Technologies Division
Exhibit A - Scope of Work and Services

v. 2009

Exhibit A - Scope of Work and Services
Eastern Area Special Schools Joint Committee

### 1.2.2   Water Conservation

Siemens shall provide complete labor, materials and equipment to provide the following scope of work for CLIENT. Work shall include required permits, inspections, set-up and commissioning.

Sinks

- Furnish and install Forty-seven (47) 0.5 gpm (gallon per minute) model aerators. These items furnished for installation on existing restroom hand washing sinks.

- Furnish and install Twenty-four (24) 1.0 gpm (gallon per minute) model aerators. These items furnished for installation on existing classroom hand washing sinks.

### Exclusions:

- Faucets set replacement parts including, but not limited to, spigots and valve parts, angle stops.

- Premium time or overtime labor. All work can be performed during normal working hours, 7am to 5pm.

- Asbestos testing and abatement.

- Any pre-existing infrastructure or flow problems.

### 1.2.3   Boiler Replacement

SIEMENS shall provide the labor, equipment and materials for the replacement of one of the existing heating boilers.  Work will include the following:

- Remove one of the two existing cast iron hot water boilers

- Modify the existing heating water piping to connect hot water supply and return to the new boiler system.

- The existing main building heating hot water pumps will remain.

- Furnish and install two (2) 850 MBH Modcon condensing heating hot water boilers, for a total input capacity of 1,700,000 BTUH.  The boilers will be installed in parallel with the remaining existing boiler. The new heating hot water boilers will have primary pumps and condensate neutralizing kits.

- The boilers will be piped to the existing piping system in a primary-secondary arrangement with the existing 5 hp pump operating as the secondary pump.

- A new primary pump will be installed on the remaining HB Smith Boiler to accommodate the new primary secondary piping arrangement.

- Install venting for the boilers in accordance with manufacturer's guidelines. Roof penetrations will be sealed in coordination with the roofing repair scope.

- New hot water heating piping will be insulated.

- System startup, checkout and adjustments are included. Electrical power wiring, starters, wiring devices and disconnects will be provided where applicable.

### 1.2.4   Domestic & Booster Heater Replacement

SIEMENS shall provide the labor, equipment and materials for the replacement of the domestic water heater and dishwasher booster heater. Work will include the following:

- Disconnect the existing 65 kW electric domestic water booster heater for the dish machine and abandon in place for emergency backup.

- Disconnect and remove the existing Lochinvar gas fired domestic heater. The large storage tank will be isolated and abandoned in place.

- Furnish and install one (1) new AO Smith BTH 199 domestic water heater with a sealed combustion chamber and 100 gallons of storage.

- Furnish and install new 180° supply and return piping from this heater to the dishwasher.

- Furnish and install a new 3-way tempering valve for the normal temperature hot water and connect to the existing.

- Install venting for the boilers in accordance with manufacturer's guidelines. Roof penetrations will be sealed in coordination with the roofing repair scope.

- All new piping will be insulated.

- System startup, checkout and adjustments are included. Provide one full year of emergency warranty service. Electrical power wiring, starters, wiring devices and disconnects will be provided where applicable.

### 1.2.5   Existing Boiler Rebuild

SIEMENS shall provide labor, equipment and materials for the rebuild of one existing boiler. The remaining HB Smith boiler will have the following repairs made to ensure proper operation when requested. Work will include the following:

- Rebuild gas train – all new gas regulators

- Tear down sectional boiler and reseal between sections

- Replace up to 3 sections of the boiler

- Clean, check and calibrate power burner

- Check and calibrate all gauges. All failed gauges will be replaced

- Check and repair/replace insulation around boiler and stack if required.

### 1.2.6   Air Handling (AHU) Control Modifications

SIEMENS shall provide labor, equipment and materials for the control modification on the existing seven (7) air handling units. Work will include the following:

- The Seven (7) AHU's will be converted to direct digital controls.

- The AHU's will function as a constant volume air handling with heating, cooling.

- The dampers and valves will be pneumatically actuated using analog to pneumatic transducers.

- The air handling units will be schedule to meet the required occupancy with optimal start/stop

### 1.2.7   Classroom Unit-Vent Modifications and Pneumatic system services

SIEMENS shall provide labor, equipment and materials for the modifications to the Classroom Unit Ventilators.  The Twenty-seven (27) existing classroom unit-ventilators will be re-commissioned and calibrated to ensure that all components are operating properly. The re-commissioning activity shall include the following:

- Pneumatic controls on the unit ventilators will be re-commissioned and replaced as necessary – including damper motors and linkages

- Fan motors will be checked (amped and tested) to determine current condition.   Motors not running or have operational issues will be replaced.

- Dampers will be re-gasketed and tested

- The pneumatic air system through-out the building will be cleaned to eliminate oil and moisture. The main air compressor and corresponding filters and regulators will be replaced.

- The (5) pneumatic zone isolation and summer/winter switch-over systems will be checked for proper operation and will be replaced with electric to pneumatic switches now part of the automation system.

**Excluded from re-commissioning scope:**

- Repair of any coils or piping

- Repair or replace drain pans

- Painting

- Repairing leaks in the existing pneumatic system

### 1.2.8   Controls Upgrade

SIEMENS shall provide all material, components and labor to install DDC controls to provide the points listed below. Work shall include all devices, electrical installation and startup for an operational system.

The following systems will be tied into to the new Siemens DDC EMS.

The existing chiller will be controlled based on outside air conditions and building demand.  The following points will be controlled:

**Air Handling Units Controls**

- Unit Stop/start and Status
- Discharge Air Temperature
- Mixed Air Temperature
- Mixing Damper Control
- Face & Bypass Damper
- Zone Temperature

**Chiller control**

- Chilled Water pump 1 & 2 start/stop
- Chilled Water Pump 1 & 2 status
- Chiller 1 & 2 Enable
- Chiller 1& 2 Status
- Chilled water supply temperature

**Boiler control**

- Primary Hot Water pump 1 & 2 start/stop
- Primary Hot Water Pump 1 & 2 status
- New Boiler Sequencer enable
- New Boiler 1& 2 Status
- Existing Boiler start/stop
- Existing Boiler status
- Outside Air  temperature
- Hot Water Supply temperature
- Return Water temperature

**Summer/Winter Switch-over System**

- Zone #1 summer/winter
- Zone #2 summer/winter
- Zone #3 summer/winter

**Zone Setback System**

- Zone #1 occupied/unoccupied
- Zone #2 occupied/unoccupied
- Zone #3 occupied/unoccupied
- Zone #4 occupied/unoccupied
- Zone #5 occupied/unoccupied
- Zone #1 temperature
- Zone #2 temperature
- Zone #3 temperature
- Zone #4 temperature

Exhibit A - Scope of Work and Services
Eastern Area Special Schools Joint Committee

- Zone #5 temperature

**Parking Lot Lighting**
- Parking Lot Lighting on/off
- Exterior Lighting on/off

### 1.2.9   EMS Interface

Siemens will install a new workstation with the Siemens APOGEE Software. The workstation consists of a personal computer (CPU-1) with printer (PTR-1) configured with Windows XP and loaded with the operator workstation interface software. The Building Level Network (BLN) connects to the PC via an Ethernet drop provided by owner.

### 1.2.10   Roof Repairs and Recoating

SIEMENS shall provide all material, components and labor to repair and recoat the existing roof. Work shall include the following:

- Install a polyurethane foam and silicone roof system:

- Furnish and install an additional Seven (7) drains throughout roof system as required to facilitate drainage.

- Remove areas of board delamination and infill with 2" faced polyisocyanurate insulation mechanically fasten into existing roof deck.

- Install additional fasteners through existing Ethylene Propylene Diene Monomer (EPDM) roofing into roof deck as required by polyurethane foam roofing manufacturer.

- Prepare roof surface prior to system application by means of power washing and / or removal of loose dirt, debris and sealants.

- Provide and install a nominal (+/- ¼") 1.5 inches of BASF polyurethane roofing foam to substrate.

- Provide and install BASF approved granules into silicone coating topcoat at a rate of ½ lb/sf.

- Includes 15 year BASF Full systems Non Pro Rated Warranty.

**CLIENT'S Responsibilities** (in addition to those in Article 6 of the Agreement):

- Restrict parking as needed for spray application.

- Supply Potable water for project duration

- Asbestos testing and abatement.

### 1.2.11 Repair Gym Fan Shaft

SIEMENS shall provide all material, components and labor to repair the existing gym fan shaft. Work shall include the following:

- Remove existing blower wheel and shaft from Nesbitt air handling unit serving the gymnasium.

- The shaft shall be repaired and re-machined to manufacturer's specifications. The blower wheel shall be rebalanced.

- If blower wheel or shaft is non-repairable, Siemens will need to re-quote pricing utilizing new parts if available.

- The blower wheel and shaft shall be re-installed with new pillow-block bearings and new sheaves.

### 1.2.12 Replace Emergency Power Automatic Transfer Switch

SIEMENS shall provide all material, components and labor to replace the emergency power automatic transfer switch. Work shall include the following:

- Remove existing 60 Amp 3 phase 277/480 volt transfer switch.

- Supply and Install a new 70 Amp 3 phase 277/480 volt Cummins transfer switch in same location as removed.

- Relocate existing electrical panel to allow installation of new transfer switch.

- Verify proper operation of new transfer switch.

### 1.2.13 Wire Heating Pump Motors onto Emergency Power Panel

SIEMENS shall provide all material, components and labor to wire the heating pumps on E-Power. Work shall include the following:

- Disconnect existing heating hot water pumps from existing normal power panel and connect to existing emergency power panel.

**1.3    CLIENT'S Responsibilities (in addition to those in Article 6 of the Agreement):**

1.3.1   Provide access to construction utilities, including electricity, water, sewer, use of designated restrooms at no additional cost. Owner shall be responsible for assisting in all required shut downs and be responsible for isolation of appropriate systems that are effect by such work.

1.3.2   Provide access to shipping/receiving (garage) area for loading/unloading materials and supplies and a secured staging area for material storage.

1.3.3   Provide SIEMENS copies of monthly utility bills for gas, electric and water.

1.3.4   Upon notification by SIEMENS' representatives of project areas suspected of containing hazardous materials, CLIENT shall contract and pay for the services of an independent third party to test and remove as necessary any Hazardous Material so that the project work may continue.

1.3.5   Repairs to existing panel boards, switchgear, motor control centers and miscellaneous electrical wiring devices, including any requirements for additional grounding.

1.3.6   Since light levels, light quality and energy savings are directly related to components installed in this project, CLIENT must use identical replacement components in the maintenance and/or group re-lamping of all the installed lighting systems covered in the scope of this project.  SIEMENS must provide written approval for any and all substitutions.

1.3.7   Provide building 24-hour accessibility, including weekends and holidays, as required by SIEMENS, and their sub-contractors.  Coordinate construction activities with facility activities.  Provide building security.

**Notes, Limitations and Exclusions:**

- All construction and building permits are included.
- Asbestos abatement is excluded.

Siemens Industry, Inc., Building Technologies Division
Exhibit A - Scope of Work and Services

v. 2009

Exhibit A - Scope of Work and Services
Eastern Area Special Schools Joint Committee

### Article 2: Work Implementation Period

2.1    Commencement of Work:

2.1.1   SIEMENS shall commence the Work within 30 calendar days from the Effective Contract Date, and shall perform the Work diligently and shall complete the Work no later than 180 calendar days from the day of commencement.

2.1.2   Milestones: Specific scheduling milestones and coordination requirements are as follows:

   To be established with CLIENT's and SIEMENS mutual agreement

### Article 3: Scope of Performance Assurance Technical Support Program

3.1    The timing of plan measurements and reporting shall coincide with the Performance Guarantee Period and shall be done annually.

3.2    SIEMENS shall provide utility verification through tracking methodologies outlined in   Exhibit C.  SIEMENS will provide a Measurement and Verification report on the savings and energy performance to the CLIENT after completion of the Project construction.  After completion of the Project construction, and on an annual basis as provided in the PASP, SIEMENS will meet with the CLIENT to formally present a performance report to document proof of performance and verify the success of the project.  SIEMENS will present this report 60 days from the end of the annual guarantee period for which the PASP is applicable.

3.3    SIEMENS shall extract trend information required for verification as outlined in Exhibit C on a monthly basis.  This information will be reviewed as part of the project performance assurance.

3.4    A quarterly review of project performance shall be performed internally by SIEMENS' Energy Engineer and Performance Assurance Specialist.

Siemens Industry, Inc., Building Technologies Division
Exhibit A - Scope of Work and Services                                    v. 2009

Exhibit A - Scope of Work and Services
Eastern Area Special Schools Joint Committee

___

### Article 4: Scope of Services-Maintenance Services Program

(Please check one box only)

☒        The follow consists of the Services to be performed by SIEMENS:

**4.1    Mechanical Services**

**Technical Support Services:**

- **Annual Maintenance:** SIEMENS will perform scheduled annual preventive maintenance in accordance with a program of standard routines as determined by its experience, equipment application, and equipment operating hours that are recommended by each equipment manufacturer and location. This service is designed to maintain the reliability and efficiency of the equipment, extend the useful life of your equipment, and provide possible indications of excessive wear and damage to the systems before a catastrophic failure occurs during the next operating season. Depending on our findings SIEMENS may also provide recommendations for additional service(s) that will better enhance equipment performance. [

- **Operating Inspection:** Through this service SIEMENS will help to assure mechanical equipment continues to operate efficiently, safely and with little operating disruptions during the operating season. SIEMENS will provide routine operating inspection(s) to check system performance in accordance with a program of standard routines as determined by its experience, the equipment manufacturer's published recommendations, equipment application, and location.    This service will focus on equipment operation, fluid levels, operating and safety controls, and safe equipment operation.  .

- **Refrigerant Analysis:** SIEMENS will perform refrigerant analysis and trend the refrigerant condition to identify contaminants and possible system malfunctions caused by the wear of moving parts, such as bearings and shafts. This predictive wear analysis helps to provide early identification of problems prior to them becoming unplanned and costly. Based on the analysis results, SIEMENS will make additional recommendations to you regarding the operation and maintenance of the chiller plant. Replacement refrigerant is outside the scope of this service. [

- **Shut Down / Annual Inspection:** SIEMENS will perform scheduled annual preventive maintenance in accordance with a program of standard routines as determined by its experience, equipment application, and equipment operating hours that are recommended by each equipment manufacturer and location. This service is designed to promote the reliability and efficiency of the equipment, and provide possible indications of excessive wear and damage to the systems before a catastrophic failure occurs during the next operating season. Depending on the findings SIEMENS may also provide recommendations for additional service(s) that will better enhance equipment performance. In addition, for centrifugal, reciprocating and screw chillers, SIEMENS will leak test all equipment containing refrigerant, report findings and provide a list of recommended repairs (if necessary). SIEMENS will recover the refrigerant as appropriate to reduce emissions and cost of

___

Exhibit A - Scope of Work and Services
Eastern Area Special Schools Joint Committee

replacement refrigerant and keep CLIENT informed regarding refrigerant issues and opportunities. All refrigerant containment will be performed in accordance with EPA regulations and guidelines.

- **Start-Up Inspection:** Through this service SIEMENS will endeavor to assure optimum system performance and safety, and assure the mechanical equipment is ready for the new operating season. SIEMENS will provide start-up services in accordance with a program of standard routines as determined by our experience, the equipment manufacturer's published recommendations, equipment application, and location. This service will focus on equipment operation, fluid levels, operating and safety controls, and safe equipment operation

**4.2    Equipment Tasking:**

The following tasks listed herein for each equipment type will be performed at the intervals planned. These tasks are designed to place the equipment into prime operating condition so that the equipment will operate effectively, reliably, and efficiently.

<u>**Chiller / Recip / Air Cooled**</u>

Operating Inspection
- Log all operating conditions
- Confirm chiller operation
- Inspect overall condition
- Check refrigerant charge
- Check lube system
- Lubricate per OEM recommendations

Start-Up Inspection
- Restore refrigerant charge to cooler
- Restore all power necessary for operation
- Check operation of condenser fans
- Verify operation of all safety controls
- Verify recommended oil sump temperature
- Start chiller and perform operating inspection

Shut Down Inspection
- Perform operating inspection
- Shut down chiller
- Lockout and tag out compressor motors
- Isolate refrigerant charge
- Inspect condenser coils
- Verify oil sump heater operation

<u>**Heating Systems / HW - Modular Boilers – Gas**</u>

Start-Up Inspection
- Refill boiler as necessary

Exhibit A - Scope of Work and Services
Eastern Area Special Schools Joint Committee

- Restore power and fuel supply
- Calibrate safety and operating controls
- Lubricate per OEM recommendations
- Verify operation of all safety controls
- Start boiler and perform operating inspection

Operating Inspection
- Log and evaluate operating conditions
- Confirm burner and fuel system operation
- Check fuel system for leaks
- Check safety and operating controls
- Check combustion air make-up system
- Check for proper venting of flue gas

### Heating Systems / HW - Cast Iron Boilers

Operating Inspection
- Log and evaluate operating conditions
- Confirm burner and fuel system operation
- Check fuel system for leaks
- Check safety and operating controls
- Check combustion air make-up system
- Check for proper venting of flue gas

Start-Up Inspection
- Refill boiler as necessary
- Restore power and fuel supply
- Calibrate safety and operating controls
- Lubricate per OEM recommendations
- Verify operation of all safety controls
- Start boiler and perform operating inspection

Siemens Industry, Inc., Building Technologies Division
Exhibit A - Scope of Work and Services

v. 2009

Exhibit A - Scope of Work and Services
Eastern Area Special Schools Joint Committee

Shut Down / Annual Inspection
- Perform operating inspection and shut down boiler
- Lockout and tag out power and secure fuel supply
- Service burner and fuel system as necessary
- Drain boiler as necessary
- Service water level controls and gauge glass
- Complete insurance inspection paperwork

## 4.3    Maintained Equipment Table

| Equipment Category | Equipment Subcategory | Equipment | Qty | Serial Number | Location | Mfg/Model |
|---|---|---|---|---|---|---|
| Chiller / Recip | Air Cooled | 25 - 30 Tons | 2 | | | |

| Heating Systems | HW - Modular Boilers - Gas | 1.3 MBTU/H & under | 2 | | | |

| Heating Systems | HW - Cast Iron Boilers | 1.3 MBTU/H & under | 1 | | | |

Siemens Industry, Inc., Building Technologies Division
Exhibit A - Scope of Work and Services
v. 2009

Exhibit A - Scope of Work and Services
Eastern Area Special Schools Joint Committee

By signing below, this Exhibit is attached to and made a part of the Agreement between SIEMENS and the CLIENT.

**CLIENT:**    Eastern Area Special Schools Joint Committee    **SIEMENS:**    Siemens Industry, Inc.

Signature: _____    Signature: _____

Printed Name: _____    Printed Name: _____

Title: _____    Title: _____

Date: _____    Date: _____

Signature: _____

Printed Name: _____

Title: _____

Date: _____

Siemens Industry, Inc., Building Technologies Division
Exhibit A - Scope of Work and Services    v. 2009

**BASF**

The Chemical Company

## Recover Full System Limited Warranty
## BASF Coating / Polyurethane Foam Roof System

| | | | |
|---|---|---|---|
| | | Warranty No.: | 6569 |
| Building: | Sunrise Schools ESPC | | Approved Applicator |
| Company: | Sunrise Schools ESPC | | |
| Address: | 550 Aura Drive | Company: | Cardinal Group Services Inc. |
| | Monroeville, PA  15146 | Address: | 244 West Airpark Road |
| | | | Central City, PA  15926 |
| Owner: | Sunrise Schools ESPC | Phone: | 814-754-1987 |
| Address: | 550 Aura Drive | Contact: | Joseph Markferding |
| | Monroeville, PA  15146 | Warranty Term: | Fifteen (15)          Years |
| Phone: | 412-862-8388 | Completion Date: | 8/30/2012 |
| Roof Status | Recover | Coating Membrane: | SPRAYCOAT Silicone |
| Structure Size: | 76,700     (Sq. Ft.) | Polyurethane Foam: | FE-348 |

Owner hereby acknowledges that the information in this document is complete and accurate and agrees to the following terms and conditions of this Recover Full System Limited Warranty.

1.  **BASF Corporation Obligations**
    a.  BASF Corporation (BASF) expressly warrants to the Owner that the BASF Coating/Polyurethane Roof System which consists of BASF Coating, BASF polyurethane foam and granules if applicable (the "System"), applied to the structure described above will remain free of water leaks which are due to deterioration of any component of the System resulting from ordinary weathering or improper workmanship in its installation.
    b.  The warranty period shall be    fifteen (15)    years from the date of completion.
    c.  BASF will, at no expense to the building owner, repair the BASF System to correct water leaks, which are due to deterioration of the System, improper workmanship, or defects in the System components, during the time of the warranty period.

2.  **Exclusions and Limitations**
    a.  BASF shall not be liable for any damage caused by the substrate (i.e. anything under the polyurethane foam), the structure itself, any other roofing components (i.e. flashings, copings, etc.), the contents of the structure, or for consequential or incidental damage, whether in contract or in tort including negligence. BASF shall not be liable for and Owner expressly waives any claims against BASF for such direct, indirect, or consequential damages.
    b.  BASF shall not be liable for discoloration or change in visual appearance due to accumulation or streaking or dirt or other airborne materials deposited on the roof surface from the atmosphere.
    c.  BASF shall not be liable for damage or failure of the BASF System, occurring after the above completion date, caused by or due to:
        1.  Lightning, earthquakes, hurricane, tornado, hail, fire, or other acts of God.
        2.  Settlement, movement, deflection, warpage, distortion, displacement, or any other failure of the structure.
        3.  Cracks, breaks, or openings in the substrate to which the BASF System was applied.
        4.  Surface alterations, additions, objects placed on or installations made on the finished roof surface without prior written approval from BASF.
        5.  Use of the finished roof surface for walking areas or recreation areas or other unusual activities or unintended uses.
        6.  Penetrations, vandalism, damage or attack by individuals, foreign objects, chemicals, animals or plant life.
        7.  Leaks due to infiltration of moisture through walls, copings, flashings, or any part of the building structure except the BASF System.
    d.  Any change in the use of the structure other than that, for which the structure was intended, voids this warranty, unless such change is first approved by BASF in writing.

3   **Owner Obligations**
    a.  In the event of damage or failure caused by any of the occurrences listed in Section 2 above, Owner shall, at his own cost, properly repair or correct such damage or failure and shall notify BASF in writing. Failure to make such repairs or corrections with in 60 days, weather permitting, may void this warranty.
    b.  Owner shall allow BASF, at its option, to periodically inspect, or have inspected, the BASF System and any other areas it determines necessary and shall provide BASF and/or its contractors, subcontractors or agents with the necessary access to conduct such inspections. BASF will advise Owner of the existence of any such damages listed in section 2 above.
    c.  This warranty is expressly conditioned upon immediate notification by Owner to both BASF and the Approved Applicator (both verbally and in writing) of any and all claims for repairs required under terms of this warranty so that an inspection by a BASF representative, at its option, may be made. This warranty shall automatically become void if BASF is not allowed to perform inspections and/or BASF's reasonable recommendations are not followed.
    d.  If Owner cannot verbally contact BASF and the Approved Applicator, and the damage to the building and its contents if imminent, Owner may make necessary temporary repairs, Provided that BASF will not be held responsible for any damage done to the BASF System by others in performing such temporary repairs.
    e.  Owner's failure to pay, when due, the full contract price for installation of the roof system voids this warranty.
    f.  Good roofing practice requires the Owner of the Owner's representative inspect this roof semi-annually during the warranty period and perform maintenance, as needed according to industry standards. Failure to inspect and maintain this roof may void this warranty.

4.  **Transfer of Warranty**
    a.  Transfer of this warranty to a new Owner may be made only if the transfer is acknowledged in writing by BASF to the new Owner. BASF must be notified at the time of sale to the new Owner and BASF must be satisfied that the intended use of the structure by the owner will not cause detriment to the BASF SPF Coating System.

5.  This Warranty shall be interpreted according to the laws of the State of Delaware.

**The foregoing shall constitute BASF's sole and exclusive liability in connection with the purchase or use of BASF's System. This warranty is in lieu of all other written and oral, express or implied warranties and BASF expressly disclaims any warranty of merchantability or fitness for particular purpose.**

Nothing in this warranty Agreement shall waive any right of BASF Corporation against the Approved Applicator or any other party due to defective workmanship the installation of the roof system.

This Warranty is effective as of the completion date.

BASF Corporation   Manager, Applications & Training   Title: _____   Date:   10/17/2012

BASF FS Recover 4-1-10  Rev. 1.1

# ANDREWS & PRICE LLC
## ATTORNEYS AT LAW

1500 Ardmore Boulevard   Suite 506   Pittsburgh, PA 15221   412-243-9700   Fax: 412-243-9660

Andrew F. Evankovich, Esq.
aevankovich@andrewsandprice.com
www.andrewsandprice.com

January 10, 2020

*Via Email (tas@maronmarvel.com) and Regular Mail*
Terry A. Schrock, Esq.
MARON, MARVEL, BRADLY, ANDERSON & TARDY
Landmark Building
Suite 250
100 West Station Square Drive
Pittsburgh, PA  15219

RE:   *EASTERN AREA SPECIAL SCHOOLS*
*SUNRISE SCHOOL ROOF*
*BASF WARRANTY NO. 6569*

Dear Mr. Schrock:

As you are aware, this office serves as Solicitor for the Eastern Area Special Schools in regard to the issue concerning the poor condition of its roof.  The roof components were supplied by BASF and a warranty was provided.  Please consider this letter as a formal claim against the warranty issued by BASF concerning the Sunrise School roof.  The School's roof is experiencing multiple leaks and we request that BASF honor its warranty and repair and/or replace the building's roof.

Considering the poor condition of the School's roof and its continuing negative effect on the education taking place at the School, it is imperative that BASF take immediate steps to remedy this situation.  Please contact me with BASF's plan to effectuate the appropriate resolution of this matter.

Very Truly Yours,

Andrew F. Evankovich

AFE/ams

Cc:   Steve Destefano
Lucy McDonough

10980.8

WHEREFORE, Plaintiffs claims of Defendants damages in an amount in excess of Arbitration Limits.

Respectfully submitted,

*/s/ Amy R. Schrempf*

Amy R. Schrempf
Pa. I.D. No. 87619

ANDREWS AND PRICE
1500 Ardmore Boulevard
Suite 506
Pittsburgh, PA 15221

## V E R I F I C A T I O N

I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.  I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. Section 4904 relating to unsworn falsifications to authorities.

Signed: _____ STEPhen P. Rusker
As President of the Eastern Area Board of School Directors
On behalf of all Plaintiffs

Date: 2/24/2021

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

EASTERN AREA SPECIAL SCHOOLS,

             Plaintiffs,

             vs.

BASF CORPORATION, and SIEMENS
INDUSTRY, INC.,

             Defendants.

CIVIL DIVISION

GD No. 21-001682

Code:  012

JURY TRIAL DEMANDED

**PRAECIPE FOR ENTRY OF
APPEARANCE**

Filed on Behalf of:
BASF CORPORATION

Counsel of Record for this Party

TERRY  A. SCHROCK, ESQUIRE
Pa. I.D. No. 87336

**MARON MARVEL BRADLEY
ANDERSON & TARDY LLC**
The Landmarks Building
Suite 250
100 West Station Square Drive
Pittsburgh, PA 15219
(412) 281-5560

{82077.00029 / W1277650}

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| EASTERN AREA SPECIAL SCHOOLS, | CIVIL DIVISION |
| Plaintiffs, | GD No. 21-001682 |
| | Code:  012 |
| vs. | |
| BASF CORPORATION, and SIEMENS INDUSTRY, INC., | |
| Defendants. | |

**PRAECIPE FOR ENTRY OF APPEARANCE**

TO:    THE ALLEGHENY COUNTY DEPARTMENT OF COURT RECORDS

Kindly enter my appearance on behalf of BASF Corp., defendant in the above-captioned matter.

Respectfully submitted,

MARON MARVEL BRADLEY
ANDERSON & TARDY LLC

By/s/ *TERRY A. SCHROCK*
    Terry A Schrock, Esquire
    Attorneys for Defendant,
    BASF, Corp.

{82077.00029 / W1277650}

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **PRAECIPE FOR ENTRY OF APPEARANCE** was served on plaintiff's counsel via postage prepaid U.S. Mail, this 7th day of April, 2021.

Amy R. Schrempf, Esquire
Andrews and Price, LLC
1500 Ardmore Blvd., Suite 506
Pittsburgh, PA 15221

By:*/s/ TERRY A. SCHROCK*

Terry A. Schrock, Esquire
MARON MARVEL BRADLEY &
ANDERSON LLC
The Landmarks Building
Suite 250
100 West Station Square Drive
Pittsburgh, PA 15219

(412) 281-5560

{82077.00029 / W1277650}

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

EASTERN AREA SPECIAL SCHOOLS,

     Plaintiff,

  v.

BASF CORPORATION, and
SIEMENS INDUSTRY, INC.,

     Defendants.

CIVIL DIVISION

No. GD 21-01682

PROOF OF SERVICE

Filed on behalf of:
EASTERN AREA SPECIAL SCHOOLS
Plaintiff

Counsel of Record for This Party:

ANDREWS AND PRICE, LLC

William C. Andrews
Pa.I.D. No. 17226

Andrew F. Evankovich
Pa.I.D. No. 53460

Amy R. Schrempf
Pa.I.D. No. 87619

ANDREWS AND PRICE, LLC
1500 Ardmore Boulevard
Suite 506
Pittsburgh, PA 15221

412-243-9700
412-243-9660 (FAX)

**JURY TRIAL DEMANDED!**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| EASTERN AREA SPECIAL SCHOOLS, ) | CIVIL DIVISION |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| BASF CORPORATION, and ) | |
| SIEMENS INDUSTRY, INC., ) | |
| ) | |
| Defendants. ) | |

## <u>CERTIFICATION AND PROOF OF SERVICE</u>

I hereby certify that those listed below were served, via United States Certified Mail, return receipt

requested, as evidenced by the green signature cards as returned and attached.

BASF
c/o CT Corporation Systems
28 Liberty Street
New York, New York 10005
(Its Service Agent)
On March 18, 2021

By:     *Amy R. Schrempf*

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CT Corporation System
28 Liberty Street
New York, New York
10005

9590 9402 6335 0296 2538 31

2. Article Number *(Transfer from service label)*

7018 2290 0001 3823 8996

PS Form **3811**, July 2020 PSN 7530-02-000-9053

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X ☐ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

MAR 1 8 2021

CT C        TION

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

EASTERN AREA SPECIAL SCHOOLS,

                  Plaintiff,

     v.

BASF CORPORATION, and
SIEMENS INDUSTRY, INC.,

                  Defendants.

CIVIL DIVISION

No. GD 21-01682

AMENDED
PROOF OF SERVICE

Filed on behalf of:
EASTERN AREA SPECIAL SCHOOLS
Plaintiff

Counsel of Record for This Party:

ANDREWS AND PRICE, LLC

William C. Andrews
Pa.I.D. No. 17226

Andrew F. Evankovich
Pa.I.D. No. 53460

Amy R. Schrempf
Pa.I.D. No. 87619

ANDREWS AND PRICE, LLC
1500 Ardmore Boulevard
Suite 506
Pittsburgh, PA 15221

412-243-9700
412-243-9660 (FAX)

**JURY TRIAL DEMANDED!**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| EASTERN AREA SPECIAL SCHOOLS, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BASF CORPORATION, and | ) | |
| SIEMENS INDUSTRY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATION AND PROOF OF SERVICE

I hereby certify that those listed below were served, via United States Certified Mail, return receipt requested, as evidenced by the green signature cards as returned and attached.

Siemans
c/o CT Corporation Systems
28 Liberty Street
New York, New York 10005
(Its Service Agent)
On March 18, 2021

Siemans
530 Lakeview Plaza Boulevard
Worthington, OH 43085
On April 22, 2021

BASF
100 Park Avenue
Florham Park, NJ 07932
On April 13, 2021

By:   *Amy R. Schrempf*

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BASF
100 Park Avenue
Florham Park, NJ 07932

9590 9402 6335 0296 2546 30

2. Article Number (Transfer from service label)

7021 0350 0000 3833 4836

**COMPLETE THIS SECTION ON DELIVERY**

Always Reliable
Delivery Service

A. Signature
X                          ☐ Agent
                           ☐ Addressee

B. Received by (Printed Name)   APR 1 3 2021   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, Authorized Agent below:              ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053            Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Siemens Industry Inc
530 Lakeview Plaza Blvd
Worthington, OH 43085

9590 9402 6508 0346 5500 06

2. Article Number (Transfer from service label)

7021 0350 0000 3833 2511

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X S. Johnston                ☐ Agent
                            ☐ Addressee

B. Received by (Printed Name)   AUG 09   C. Date of Delivery  4/22/4

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
   Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053            Domestic Return Receipt

21- 1682

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CT Corporation System
28 Liberty Street
New York, New York
10005

9590 9402 6335 0296 2538 31

2. Article Number *(Transfer from service label)*

7018 2290 0001 3823 8996

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

MAR 1 8 2021

CT CORPORATION

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

Sieman's service Agent

21-1682

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

EASTERN AREA SPECIAL SCHOOLS,

              Plaintiffs,

                vs.

BASF CORPORATION, and SIEMENS
INDUSTRY, INC.,

              Defendants.

CIVIL DIVISION

GD No. 21-001682

Code:  012

JURY TRIAL DEMANDED

**ANSWER, AFFIRMATIVE DEFENSES
AND CROSSCLAIMS FOR
INDEMNIFICATION, CONTRIBUTION
AND/OR SET-OFF OF DEFENDANT
BASF CORPORATION TO PLAINTIFF'S
COMPLAINT**

Filed on Behalf of:
BASF CORPORATION

Counsel of Record for this Party

TERRY  A. SCHROCK, ESQUIRE
Pa. I.D. No. 87336

**MARON MARVEL BRADLEY
ANDERSON & TARDY LLC**
The Landmarks Building
Suite 250
100 West Station Square Drive
Pittsburgh, PA 15219
(412) 281-5560

Internal

IN THE COURT OF COMMON PLEAS OF ALLEGHENY
COUNTY PENNSYLVANIA

| | | |
|---|---|---|
| EASTERN AREA SPECIAL SCHOOLS, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | GD No. 21-001682 |
| BASF CORPORATION, and | ) | |
| SIEMENS INDUSTRY, INC., | ) | |
| | ) | |
| Defendants. | ) | TRIAL BY JURY OF |
| | ) | TWELVE DEMANDED |
| | ) | |

**ANSWER, AFFIRMATIVE DEFENSES AND CROSSCLAIMS FOR
INDEMNIFICATION, CONTRIBUTION AND/OR SET-OFF OF DEFENDANT
BASF CORPORATION TO PLAINTIFF'S COMPLAINT**

BASF Corporation ("Answering Defendant"), by and through its undersigned counsel, hereby responds to plaintiff's Complaint (the "Complaint") and asserts Affirmative Defenses and Crossclaims.  In support thereof, Answering Defendant avers as follows:

1.      Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 1 and, therefore, denies same.

2.      Admitted that Answering Defendant is a Delaware corporation whose registered agent for service of process is 370 Frankfort Road, Monaca, Beaver County, PA.  Its North American headquarters or its principal place of business is located at 100 Park Ave., Florham Park, New Jersey 07932.

3.      Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 3 and, therefore, denies same.

4.      Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 4 and, therefore, denies same.

5.      Paragraph 5 refers to a contract with a party other than Answering Defendant, and therefore no response is required.  To the extent a response is required, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 5 and, therefore, denies same.

6.      Paragraph 6 refers to a contract with a party other than Answering Defendant, and therefore no response is required.  To the extent a response is required, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 6 and, therefore, denies same.

7.      Paragraph 7 refers to a contract with a party other than Answering Defendant, and therefore no response is required.  To the extent a response is required, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 7 and, therefore, denies same.

8.      Paragraph 8 refers to a party other than Answering Defendant, and therefore no response is required.  To the extent a response is required, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 8 and, therefore, denies same.

9.      Denied.  Paragraph 9 refers to a contract to which Answering Defendant is not a party. BASF did not manufacture the roofing system components pursuant to any contractual obligation

10.     Denied.  Paragraph 10 refers to a contract to which Answering Defendant was not a party.  Any warranty referred to exists separate and apart from any contract referred to in Paragraph 10.

11.     Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 11 and, therefore, denies same.

12.     Paragraph 12 refers to parties other than Answering Defendant, and therefore no response is required.  To the extent a response is required, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 12 and, therefore, denies same.

13.     Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 13 and, therefore, denies same.

14.     Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 14 and, therefore, denies same.

15.     Admitted in part, denied in part.  It is admitted that representatives of BASF were present at Sunrise School on or about October 10, 2019 to review the structure. Without factual discovery the Answering Defendant is without sufficient knowledge or information to address whether there has been a "roofing system failure" as stated in Paragraph 15 and, therefore, denies the same.  Without factual discovery Answering Defendants is without sufficient knowledge or information to address whether "all parties" convened on October 10, 2019, and there denies the same.

16.     Denied as stated.  Without factual discovery the Answering Defendant is without sufficient knowledge or information to respond to the allegation of Paragraph 16 that no action was taken and, therefore, denies the same.  To the extent that Paragraph 16 refers to parties other

than the Answering Defendant no response is required.  To the extent a response is required, as to other parties, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 16 and, therefore, denies the same.

17.     Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 17 and, therefore, denies same.

18.     Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 18 and, therefore, denies same.

19.     Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 19 and, therefore, denies same.

20.     Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 20 and, therefore, denies same.

21.     Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 21 and, therefore, denies same.

## COUNT I

22.     Paragraph 22 of Plaintiff's Complaint is an incorporation paragraph and requires no response.  To the extent a response is required Answering Defendant hereby incorporates by reference its answers to Paragraphs 1 through 21 of plaintiff's Complaint as if fully set forth herein.

23.-34. The entirety of the allegations of Count I, Paragraphs 22 through 34, refers to a contract with, and performance by, a party other than Answering Defendant, and therefore no response is required.  To the extent a response is required, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Count I, Paragraphs 22 through 34 and, therefore, denies same.

## COUNT II

35.     Paragraph 35 is an incorporation paragraph and requires no response.  To the extent a response is required Answering Defendant hereby incorporates by reference its answers to Paragraphs 1 through 34 of plaintiff's Complaint as if fully set forth herein.

36.     Paragraph 36 refers to a contract with, and performance by, a party other than Answering Defendant, and therefore no response is required.  To the extent a response is required, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 36 and, therefore, denies same.

37.     Admitted in part, denied in part.  Part of Paragraph 37 refers to a contract with, and performance by, a party other than Answering Defendant, and therefore no response is required. To the extent a response is required, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 37 referring to any agreement among parties other than Answering Defendant. It is admitted that BASF supplied roofing components.

38.     Paragraph 38 is admitted in part, denied in part. It is admitted that BASF provided the Plaintiff with a warranty.  The remainder of Paragraph 38 is denied, as the allegations set forth in Paragraph 38 of Plaintiff's complaint refer to a written warranty, which speaks for itself.

39.     Paragraph 39 contains conclusions of law to which no response is required. To the extent Paragraph 39 also contains factual allegations, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 39 and, therefore, denies same.

40.     Paragraph 40 is admitted in part, denied in part.  It is admitted that Plaintiff notified BASF.  It is admitted that Exhibit C is a letter dated January 10, 2020.  Without factual discovery

Answering Defendants is without sufficient knowledge or information to address whether "all parties" met onsite on October 10, 2019, and there denies the same.

41.    Paragraph 41 contains conclusions of law to which no response is required.

42.    Paragraph 42 contains conclusions of law to which no response is required.  To the extent Paragraph 42 also contains factual allegations, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 42 and, therefore, denies same.

43.    Paragraph 43 contains conclusions of law to which no response is required.  To the extent Paragraph 43 also contains factual allegations, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 43 and, therefore, denies same.

44.    Paragraph 44 contains conclusions of law to which no response is required.  To the extent Paragraph 44 also contains factual allegations, Answering Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 44 and, therefore, denies same.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the applicable statute of limitations and any applicable statute of repose.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the Doctrine of Latches.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's failure to mitigate damages, if any, acts to bar plaintiff's claim against Answering Defendant.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the Doctrine of Estoppel.

## FIFTH AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SIXTH AFFIRMATIVE DEFENSE

Answering Defendant is immune from liability for any conduct performed in conformance with government specifications and/or the specifications mandated by the plaintiff or those of co-defendant Siemens.

## SEVENTH AFFIRMATIVE DEFENSE

Answering Defendant, at all relevant times, complied with all applicable Federal, State and other regulations.

## EIGHTH AFFIRMATIVE DEFENSE

This action is barred by plaintiff's failure to satisfy a condition precedent.

## NINTH AFFIRMATIVE DEFENSE

The action is barred pursuant to the doctrine of *forum non conveniens.*

## TENTH AFFIRMATIVE DEFENSE

This action is barred by the doctrine of sophisticated purchaser.

## ELEVENTH AFFIRMATIVE DEFENSE

This action is barred in whole or in part by the doctrine of unjust enrichment.

## TWELFTH AFFIRMATIVE DEFENSE

This action is barred by the doctrine of novation.

## THIRTEENTH AFFIRMATIVE DEFENSE

This action is barred by the merger doctrine.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the Spearin Doctrine.

## FIFTEENTH AFFIRMATIVE DEFENSE

This action is barred by assumption of the risk.

## SIXTEENTH AFFIRMATIVE DEFENSE

This action is barred by plaintiff's non-compliance with conditions of warranty.

## SEVENTEENTH AFFIRMATIVE DEFENSE

This action is barred in whole or in part by the contractual limitations of the plaintiff's remedies.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff failed to provide timely notice.

## NINETEENTH AFFIRMATIVE DEFENSE

This action is barred by plaintiff's waiver.

## TWENTIETH AFFIRMATIVE DEFENSE

This action is barred by plaintiff's failure to exhaust other remedies.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

This action is barred by the plaintiff as there was no breach of warranty.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

This action is barred by the plaintiff's failure to disclose.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

This action is barred by lack of jurisdiction.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

The alleged incident, injuries and damages of which plaintiff complains were caused by unauthorized, unintended or improper use of the products complained of and as a result of the failure to exercise reasonable and ordinary care, caution or vigilance for which Answering Defendant is not legally liable or responsible.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Answering Defendant reserves the right to assert any and all other affirmative defenses which discovery and a determination of the applicable state law may reveal to be appropriate.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiff's alleged injuries or damages, if any, were caused by pre-existing building conditions, substantially flawed building conditions, and the natural course of those conditions.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiff failed to join necessary parties without whom complete relief cannot be granted and will leave Answering Defendant with the substantial risk of incurring double, multiple or inconsistent obligations and, therefore, the Complaint should be dismissed.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims and causes of action are barred in whole or in part because Answering Defendant owed no legal duty to the Plaintiff or, if it did owe a legal duty, it did not breach that duty.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims and remedies are excluded or limited by the Recover Full System Limited Warranty dated October 17, 2012.  The warranty excludes any consequential or incidental damages and the plaintiff expressly waived any claims against BASF for direct, indirect, or consequential damages.

## THIRTIETH AFFIRMATIVE DEFENSE

Interpretation of the warranty as to plaintiff's claims and remedies are to be interpreted under Delaware law.

## CROSSCLAIM FOR INDEMNIFICATION

This Answering Defendant denies that it has any liability to plaintiff.  However, if this Answering Defendant is held liable to answer to plaintiff under the allegations against it in the Complaint, then Answering Defendant is entitled to indemnification from other defendants in any amount that this Answering Defendant may be required to pay plaintiff.

## CROSSCLAIM FOR CONTRIBUTION AND/OR SETOFF

While Answering Defendant denies liability in all aspects, it alternatively avers that, should it be found liable in any respect, Answering Defendant seeks contribution and/or set-off for all claims made or to be made by plaintiff against any and all co-defendants.

WHEREFORE, Defendant BASF Corporation respectfully requests that judgment be entered in its favor and against plaintiff and that it be awarded costs, fees and such other relief as this Court deems just and proper.

**MARON MARVEL BRADLEY
& ANDERSON LLC**

/s/ *Terry A. Schrock*
Terry A. Schrock (PA ID: 87336)
Landmarks Building, Suite 250
100 West Station Square Drive
Pittsburgh, PA 15219
Telephone: (412) 281-5560
Facsimile: (412) 281-5522
tas@maronmarvel.com
Attorneys for Defendant
BASF Corporation

Date: May 17, 2021

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| EASTERN AREA SPECIAL SCHOOLS, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. GD 21-1682 |
| | ) | |
| BASF CORPORATION, and | ) | |
| SIEMENS INDUSTRY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### **IMPORTANT NOTICE**

TO:   SIEMANS INDUSTRY, INC.
      530 Lakeview Plaza Boulevard
      Worthingon, OH 43085

YOU ARE IN DEFAULT BECAUSE YOU HAVE FAILED TO ENTER A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND FILE IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU. UNLESS YOU ACT WITHIN TEN DAYS FROM THE DATE OF THIS NOTICE, A JUDGMENT MAY BE ENTERED AGAINST YOU WITHOUT A HEARING AND YOU MAY LOSE YOUR PROPERTY OR OTHER IMPORTANT RIGHTS.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Allegheny County Bar Association Lawyer Referral Service
400 Koppers Building - 436 Seventh Ave.
Pittsburgh, Pennsylvania, 15219

Telephone: 412-261-5555
E-mail: LRS@acba.org

Respectfully submitted,

**DATED: MAY 18, 2021**

Amy R. Schrempf

**ANDREWS & PRICE LLC**
ATTORNEYS AT LAW

1500 Ardmore Boulevard, Suite 506
Pittsburgh, PA 15221

PITTSBURGH PA 150
18 MAY 2021PM 8 L

NEOPOST
05/17/2021
US POSTAGE $000.51⁰

FIRST-CLASS MAIL

ZIP 15221
041M11282685

Siemans
530 Lakeview Plaza Boulevard
Worthington, OH 43085

43085-471059

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

EASTERN AREA SPECIAL SCHOOLS,

              Plaintiff,

    v.

BASF CORPORATION, and
SIEMENS INDUSTRY, INC.,

              Defendants.

CIVIL DIVISION

No. GD 21-01682

STIPULATION OF CONSENT TO FILE
AMENDED ANSWER

Filed on behalf of:
EASTERN AREA SPECIAL SCHOOLS
Plaintiff

Counsel of Record for This Party:

ANDREWS AND PRICE, LLC

William C. Andrews
Pa.I.D. No. 17226

Andrew F. Evankovich
Pa.I.D. No. 53460

Amy R. Schrempf
Pa.I.D. No. 87619

ANDREWS AND PRICE, LLC
1500 Ardmore Boulevard
Suite 506
Pittsburgh, PA 15221

412-243-9700
412-243-9660 (FAX)

**<u>JURY TRIAL DEMANDED!</u>**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

EASTERN AREA SPECIAL SCHOOLS,    )    CIVIL DIVISION
    )
    Plaintiff,    )
    )
    v.    )
    )
BASF CORPORATION, and    )
SIEMENS INDUSTRY, INC.,    )
    )
    Defendants.    )

## STIPULATION OF CONSENT TO FILE AMENDED ANSWER

AND NOW comes the Plaintiff, Eastern Area Special Schools and Defendant BASF and file this Stipulation of Consent to File Amended Answer as follows:

1.    Plaintiff has filed a Complaint at the above docket and has obtained service on Defendant BASF.

2.    Defendant BASF, through counsel, filed an Answer to the Complaint on May 17, 2021.

3.    That Answer failed to conform to Pennsylvania Rules of Court, specifically in that Affirmative Defenses were not raised in New Matter or were the paragraphs consecutively numbered as required.

4.    The parties have agreed to consent to the filing of an Amended Answer, in similar substance, but that conforms with Rules of Court so that a responsive pleading can be filed.

STIPULATED TO BY:

_____
Amy R. Schrempf
Counsel for Plaintiff, Eastern Area Sp. Schools

_____
Terry A. Schrock
Counsel for Defendant, BASF